UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAL DEV,

               Plaintiff,

      v.

PATRICK R. DONAHOE,
POSTMASTER GENERAL OF THE
UNITED STATES POSTAL SERVICE,
AND DOES 1-15 INCLUSIVE,

               Defendant.

No.  2:11-cv-2950-JAM-EFB PS

FINDINGS AND RECOMMENDATIONS

This matter was before the court on May 22, 2013, for hearing on defendant's motion for summary judgment.[1]  Plaintiff Lal Dev appeared in pro se.  Assistant U.S. Attorney Edward A. Olsen appeared on behalf of the defendant.  After careful consideration of the moving and opposing papers and the oral arguments, the court stated on the record its oral analysis of the issues, including its submission of one claim and its conclusion that summary judgment must be granted on all other claims.  The court further indicated that written findings and recommendations would subsequently issue.  For the reasons stated by the court at oral argument and as set forth below, defendant's motion for summary judgment must be granted.

---

[1] After that hearing, and while the instant motion was under submission, Dev file a motion for recusal.  ECF No. 124.  That motion is denied in a separate order filed concurrently with these findings and recommendations.

1

1        I.        PROCEDURAL BACKGROUND

2        On November 7, 2011, plaintiff, Dev, a postal employee, filed this action against Patrick

3    R. Donahoe, Postmaster General of the United States, pursuant to Title VII of the Civil Rights

4    Act of 1964.[2]   Compl., ECF No. 1.  Dev alleges racial discrimination in his employment based on

5    six events:  (1) Dev was denied what is referred to as the "high option" on Rural Route 8; (2)

6    Dev's request to invalidate the 2010 National Count evaluation of Rural Route 8 was denied; (3)

7    the Postmaster did not give Dev additional territory for his route after the Postmaster consolidated

8    Rural Routes 18 and 19 and distributed territory from those routes to various other routes; (4) Dev

9    did not timely receive new case labels and rearrangement of his Delivery Point Sequence ("DPS")

10   in the order he wanted after he began carrying Rural Route 8; (5) the Postmaster humiliated Dev

11   on the work floor;[3] and (6) Dev was denied a detail to a temporary supervisor position referred to

12   as a "204b position."

13       Defendant moves for summary judgment, arguing that (1) plaintiff cannot present

14   evidence sufficient to establish a *prima facie* case of disparate treatment, and (2) even assuming a

15   *prima facie* case, Dev presents no evidence to show that defendant's articulated legitimate, non-

16   discriminatory reasons for the purported adverse actions are pretextual, and (3) Dev fails to

17   present evidence sufficient to establish a genuine dispute of material fact that he was subjected to

18   a hostile work environment.  Def.'s Mot. for Summ. J., ECF No. 55 at 6.[4]

19       Plaintiff filed a motion to strike defendant's motion for summary judgment, ECF No. 61,

20   and requested additional time to file his opposition, ECF No. 69.  The court denied the motion to

21   _____

22   [2] This action proceeds before the undersigned pursuant to Eastern District of California Local
     Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

23

24   [3] Plaintiff did not respond to the motion for summary judgment as to this alleged event.  When
     asked at the hearing whether he had abandoned the claim he responded "I didn't have time to
     respond to that, so however you so deem appropriate."  ECF No. 122 at 43 of 45.  Plaintiff
25   appears to have abandoned the claim.  Furthermore, even if not abandoned, summary judgment is
     appropriate as to this claim for the reasons stated at oral argument.  *See id.* at 43-44 of 45.
26

27   [4] The references to pages numbers herein refer to the pagination assigned by the court's
     Electronic Case File ("ECF") system and as depicted on the docket and not necessarily those
28   assigned by the parties.

2

1   strike but granted plaintiff's request for an extension of time.  ECF No. 74.  Plaintiff then filed an

2   opposition to the motion, ECF Nos. 101 and 103, along with numerous motions to strike all or

3   portions of some of the declarations and exhibits attached to defendant's motion for summary

4   judgment, ECF Nos. 71, 73, 76, 77, 78, 82, 86; a motion to add defendants, ECF No. 83; and

5   numerous requests to file deposition transcripts, ECF Nos. 70, 72, 75, 85, 102.  As discussed

6   below, those motions are denied.

7          II.      FACTS

8                   A.       Rural Letter Carriers

9          Dev is employed by the United States Postal Service as a rural letter carrier at the Rocklin

10  Post Office.  Def.'s Stmt. of Undisp. Facts ("SUF")(ECF No. 55-2) 1 and 2 (Dec. of Cheri Smith,

11  ECF No. 55-10, ¶ 7); Pl.'s Resp. to SUF ("RSUF")(ECF No. 101) 1 and 2.  He is a native of India

12  and his race is Asian Indian.  SUF 3 (Compl. ¶ 25); RSUF 3.

13         Rural letter carriers are unionized under the National Rural Letter Carriers' Association

14  ("Association"), which has a collective bargaining agreement ("Agreement") with the Postal

15  Service.  SUF 4 (Dec. of Sandra Schmidt ¶ 5); RSUF 4.  While this Title VII case presents a

16  claim for alleged employment discrimination, and is not a Merit System Protection Board appeal,

17  Dev pursued grievances over some of the events at issue here which inform the background to

18  this case.  The Agreement that governed the events in this case was the 2006-2010 Agreement.

19  SUF 5 (Dec. of Edward Olsen at Ex. A); RSUF 5.  There are currently 18 full-time and 9 part-

20  time rural letter carriers at the Rocklin Post Office.  Smith Dec., ECF No. 55-10, ¶ 6.  The

21  Postmaster at the Rocklin Post Office is Cheri Smith.  *Id.* ¶ 1.  Ms. Smith is a Caucasian, white,

22  female.  *Id.* ¶ 5.

23         Much of Dev's complaints concern the classification or evaluation of his mail route.

24  Rural carriers are not paid by the hour and instead are paid a salary based on the evaluated time

25  for completion of the route to which the rural carrier is assigned.  SUF 6, 7 (Schmidt Dec. ¶ 6).

26  The evaluated time for a rural route is determined by three elements: (1) the length of the route,

27  (2) the number of mail boxes, and (3) the weekly average of mail delivered.  SUF 8.

28  /////

The weekly average of mail is determined by a mail count.  SUF 9 (Schmidt Dec. ¶¶ 6, 8); RSUF 9.  In light of the fact that rural routes are reviewed periodically, the evaluated time for a rural carrier's route can be adjusted from year to year, SUF 10 (Schmidt Dec. ¶ 7); RSUF 10, and a rural carrier's pay changes with the size of his or her route, SUF 11 (Schmidt Dec. ¶ 7); RSUF 11.  Rural routes are classified by the number of days that the carrier works during a pay period. SUF 12 (Schmidt Dec. ¶ 12); RSUF 12.  There are 12 working days in a pay period.  SUF 13 (Schmidt Dec. ¶ 12); RSUF 13.  A "K Route" is one in which the carrier works 10 days in the pay period.  SUF 14; RSUF 14.  A "J Route" is one in which the carrier works 11 days in the pay period.  SUF 15; RSUF 15.  An "H Route" is one in which the carrier works all 12 days in the pay period.  SUF 16; RSUF 16.  An "L Route Classification" is a route with a density of 12 or more boxes per mile.  SUF 17; RSUF 17.

In some circumstances, a rural carrier has the opportunity to elect either a high or low option for his or her route.  SUF 18 (Schmidt Dec. ¶ 13); RSUF 18.  If the high option is elected, the carrier must work an additional day in the pay period.  SUF 19; RSUF 19.  If a rural carrier elects the high option, that carrier is essentially asking to work more hours with a resulting increase in pay.  SUF 20; RSUF 20.  As an example, defendant notes that if the standard hours and minutes of a route are 46:42, the carrier can elect to work 11 days (low option) or 12 days (high option) in the pay period.  SUF 21; RSUF 21.  Any rural carrier whose route may be classified in more than one evaluated classification may elect the higher route classification if certain requirements are met.  First, it must be demonstrated that the rural carrier's actual work hours will not exceed 2,080 during the "guarantee period" and that determination must take into consideration, but not be limited to, the rural carrier's performance during the previous year. Second, the carrier must agree in writing to use sufficient annual leave to assure that the total actual hours worked will not exceed the 2,080 annual guarantee; and (3) the rural carrier must be in a 6 or 8-hour leave category.  Schmidt Dec. ¶ 13; Pl.'s Opp'n, ECF No. 101 at 6.

According to the defendant, rural carriers may only elect options at the time of the National Count (which occurred in 2010 between February 27, 2010 through March 12, 2010, SUF 25, RSUF 25), a Special Count, an Interim Adjustment (whenever there is a specified

4

increase or decrease in the route's evaluation), and at the beginning of the annual guarantee period.[5]  SUF 22 (Schmidt Dec. ¶ 15).  Dev, however, contends that the drafters of the rule intended that high option could be elected at any time throughout the year, as long as the carrier signs the leave commitment.  ECF No. 101 at 7-8.  This disagreement is of some significance and is discussed in detail below.

### B.   Rural Route 8

Dev applied for and was selected as the carrier for Rural Route 8.  He complains, however, that he was not given the high option for this route based upon unlawful discrimination.  While the characterization of what occurred regarding Rural Route 8 is disputed, the material facts are not.

In early February of 2010, Dev submitted his bid to become the carrier for Rural Route 8 at the Rocklin Post Office.[6]  SUF 28 (Smith Dec. ¶ 8); RSUF 28.  According to Dev, Route 8 was posted on February 9, 2010, was posted for 10 days from February 9, 2010 to February 18, 2010, and Dev submitted three bids in response to the notice of vacancy.  RSUF 28 (Dev Affidavit ("Aff.") ¶ 25).  Rural Route 8 had become vacant when the previous carrier of that route was terminated from the Postal Service.  SUF 29 (Smith Dec. ¶ 9); RSUF ¶ 29.  Defendant notes that Rural Route 8 was posted with the low option.  SUF 30 (Smith Dec. ¶ 11; Schmidt Dec. ¶ 17).  Dev, however, contends that even though Rural Route 8 was posted as a low option vacancy, both options were available and it could have been posted as a high option position.  RSUF 30 (Dev Aff. ¶ 26).

Defendant presents evidence showing that on February 10, 2010, Rural Route 8 was posted as vacant on the Employee Master File maintained on what the parties call "Eagan's

---

[5] A guarantee period is a specified period of fifty-two consecutive weeks during which rural letter carriers are guaranteed an annual wage for hours worked up to a maximum of 2080 hours.  SUF 23; RSUF 23.  The guarantee period in 2010 began on October 23, 2010.  SUF 24 (Schmidt Dec. ¶ 16); RSUF 24 (disputed as immaterial).

[6] Dev previously was the carrier for Rural Route 16 at the Rocklin Post Office, which was classified as an LH45, meaning that it was evaluated at 45 weekly hours with no relief days.  SUF 26 & 27 (Smith Dec. ¶ 7, Schmidt Dec. ¶ 19); RSUF 26.

1  Mainframe."[7]  ECF No. 55-9 at 4 (Schmidt Dec. ¶ 20) and 55-9 at 8 (Ex. A thereto).

2  Notwithstanding that documentation, Dev quibbles with the date.  He argues that "[i]t is absurd

3  that Rural Route 8 . . . walked all the way to Eagan's Mainframe and became vacant there.  The

4  fact of the matter is that Rural Route 8 . . . became vacant on January 9, 2010."  RSUF 31 (citing

5  no evidence).  Although plaintiff seems to suggest that the route should have been posted prior to

6  the effective date of the vacancy, defendant counters that a notice of vacancy cannot be posted

7  until the route is officially vacant.  SUF 33 (Schmidt Dec. ¶ 22).  Regardless of whether it could

8  have been posted as available sooner, it was not.  The printout from the mainframe does, indeed,

9  show the "vacancy" for Route 8 under the heading "EFF-DATE" with the entry of "02-10-10."

10  While the printout is not easily discerned, it depicts entries showing the carrier changes for Route

11  8 in 2010.  It lists the names, dates and route evaluations for the carriers assigned to Route 8.  It

12  lists a carrier identified as "DA PETERSEN" as being assigned to the route as of "1-30-10."  It

13  next shows the entry of "VACANCY" with the effective date of 02-10-10."  Next it lists the entry

14  of "L DEV" with the effective date of "03-13-10."  ECF No. 55-9 at 8.

15       Under the Agreement between the Postal Service and the Association, the Postmaster is

16  required to post a notice of vacancy for a vacant rural route at the post office for 10 calendar days.

17  SUF 34 (Schmidt Dec. ¶ 3; Olsen Dec. at Ex. A (Agreement, Art. 12.3)); RSUF 34.  Carriers who

18  are interested in bidding on a posted vacant route may then submit bids during this period.  SUF

19  35; RSUF 35.  In 2010, the Rocklin Post Office had a wooden bid box mounted on the wall next

20  to the custodian closets at the post office in which rural carriers could deposit bid cards.  SUF 36

21  (Smith Dec. ¶ 13); RSUF 36.

22  /////

23  _____

24  [7] Apparently the name Eagan's Mainframe is, in part, a reference to a master file either
   maintained or administered by personnel in Eagan, Minnesota.  The parties use the name to refer
25  to the official Employee Master File for the Postal Service.  That master file is maintained online
   and contains the rural route evaluation-classification menu.  Each time that a route adjustment is
26  made in the Rocklin Post Office, the Rocklin Postmaster must send the adjustment paperwork to
   Operations Program Support Specialist, Sandra Schmidt for review.  Ms. Schmidt, in turn, places
27  that information into what the parties refer to as Eagan's Mainframe, where the data is
   electronically stored and can be accessed and viewed.  SUF 31, 32 (Schmidt Dec. ¶¶ 21, 22;
28  Smith Dec. ¶¶ 12, 47).

1    The Agreement provides that the vacant route must be awarded to the senior qualified

2    bidder within 10 days, and the successful bidder must then be placed into his or her new

3    assignment within 21 days of being designated the successful bidder.  SUF 37 (Schmidt Dec.

4    ¶ 33); RSUF 37 (not genuinely disputed in substance).  Dev was selected as the senior qualified

5    bidder for Rural Route 8 and was placed into this new assignment on March 13, 2010.  SUF 38

6    (Smith Dec. ¶ 16; Schmidt Dec. ¶¶ 23, 25; Olsen Dec. at Ex. I).  Dev concedes that he was

7    selected as the successful bidder, but simply disputes the date on which assignment should been

8    effective.  He maintains that that it should have been on February 18, 2010.[8]  RSUF 38 (Dev Aff.

9    ¶ 27).

10    When Dev began this new assignment, Rural Route 8 was classified as an LK40, meaning

11    that it was evaluated at 40 weekly hours with 2 paid relief days during the pay period.  SUF 41

12    (Schmidt Dec. ¶ 26).  Dev, however, contends that Rural Route 8 should have had both options

13    available and there were no "2 paid relief days."  RSUF 41 (Dev Aff. ¶ 29).

14    According to defendant, the Postmaster informed Dev that he was not eligible for the high

15    option because he was not the assigned rural carrier for Rural Route 8 during the 2010 National

16    Count, which occurred between February 27, 2010, and March 12, 2010.  SUF 42 (Smith Dec.

17    ¶ 20).  Nonetheless, Dev claims that he was assigned the route on February 27, 2010, and that

18    Form 4241 shows this.[9]  Accordingly, he concludes that he was the carrier of record for Rural

19    Route 8 during National Count 2010.  He also contends that he was granted the high option in

20    March 2010.  RSUF 42 (Pl.'s Ex. 21, ECF No. 103).

21    /////

22    _____

[8] Dev asserts that because new assignments in the Postal Service occur on the first day of a pay
23    period, the Postmaster should have placed him into Rural Route 8 on February 27, 2010.
However, the documentation shows that the Postmaster placed Dev into Rural Route 8 on March
24    13, 2010.  Smith Dec. ¶¶ 16, 17; Schmidt Dec. ¶¶ 23-25; Olsen Dec. ¶ 10.  The parties agree that
new assignments in the Postal Service begin on the first day of a pay period, and—significantly--
25    March 13, 2010 was the first day of a pay period in 2010.  SUF 39-40 (Schmidt Dec. ¶¶ 24-25);
RSUF 39-40 (disputed as immaterial only).
26

27    [9] Dev makes this representation in spite of the entry on the Employee Master File showing Dev
was assigned to the route on "03-13-10."  ECF No. 55-9 at 8.  However, the form he relies on
28    simply fails to support his factual contention.  *See* discussion below at pp. 35-36.

Dev says that when he learned that he was not eligible for the high option on Rural Route 8 and could not change his low option to high option until the next guarantee period (which began on October 23, 2010), he filed a grievance through the Association.  SUF 43 (Smith Dec. ¶ 20); RSUF 43 (disputed as immaterial only).  The theory underlying Dev's grievance is convoluted, but can be summarized as follows: the notice of vacancy for Rural Route 8 was posted on February 9, 2010 (not February 10 as defendant contends); the Agreement provides that a vacant route must be awarded to the senior qualified bidder within 10 days of when the vacancy is posted; he was declared the senior qualified bidder for Rural Route 8 on February 18, 2010; the Agreement provides that the successful bidder must be placed into his new assignment within 21 days of when he or she is declared the senior qualified bidder and, therefore, he should have been placed into Rural Route 8 no later than March 11, 2010; and he was eligible for high option on Rural Route 8 because he should have been placed into his new assignment during the National Count (which ran from February 27, 2010 to March 12, 2010).

The union took the following position during the grievance process:

> The [Association] contends that management has the right to post vacant routes at their discretion.  The option on this route was posted at the low option.  The grievant had ample time to carefully review the bid and withdraw his bid at any time during the posting of the route.  The grievant took possession of Rural Route 8 after the 2010 mail count.  The grievant can only select the high option after the guarantee period or if there is an hour change which could change the status of his route.  Grievant bid on a low option route. The grievant took possession of the route on 3-13-2010 and could have filed a grievance within the 14 day grievance time limit.  The grievant can change options at a later date, before the next guarantee period or the next mail count or if a significant change in the route[']s evaluation (base hour change).

Smith Dec. ¶ 21.

The grievance was settled between the union and the Postal Service on June 9, 2010, as follows: "Grievant has the right to change to high/low option during the guarantee period Management posted the [R]ural [R]oute 8 at low option.  Grievant had plenty of time to pull his bid.  Route was posted correctly per [Agreement]."  SUF 44, 45 (Smith Dec. ¶ 22); RSUF 44-45 (disputed as immaterial and to say that the posting for Route 8 was incorrect) (Dev Aff. ¶ 30).

/////

8

Dev submitted his request for the high option on September 28, 2010, but the Postmaster returned it to him and informed him that the guarantee period did not begin until October 23, 2010, and that he could submit his request at that time.  Pl.'s Ex. 61, ECF No. 103 at 154. Plaintiff resubmitted the request on October 14, 2010.  *Id* at 156.  Ultimately, Dev successfully elected high option for Rural Route 8 effective October 23, 2010, which was the beginning of the guarantee period in 2010.  SUF 47 (Smith Dec. ¶ 25; Schmidt Dec. ¶ 30); RSUF 47.  However, he asserts that he had to submit another grievance to obtain it.  Although the circumstances are not clear, Dev submits a copy of the grievance form dated October 27, 2010.  Pl.'s Ex. 44 (ECF No. 103 at 108).  It states that on October 25, 2010, he reported to work but a supervisor informed him that he was not scheduled and that someone else worked the route in question.  *Id.*; *see also* Dev Aff. ¶ 3.  However, that exhibit also shows that the Postmaster overruled the supervisor with the notation that "Carrier should be paid, as new guaranteed period, carrier selected High Option and [illegible] worked route."  Pl.'s Ex. 44.

It is undisputed that Dev's high option was made effective on October 23, 2010 and that he was paid accordingly.  SUF 48 (Smith Dec. ¶ 26); RSUF 48 (disputed only as to characterization – Dev had to file a grievance to be granted the high option on November 3, 2010, which was made effective retroactively to October 23, 2010).

Another rural carrier, Kimberly Powell, also successfully elected the high option on her route (Rural Route 2) at the beginning of the guarantee period on October 23, 2010.  SUF 49 (Smith Dec. ¶ 27; Schmidt Dec. ¶ 31); RSUF 49.

According to defendant, a carrier by the name of Loren Bell (Rural Route 15) chose the high option following the 2010 National Count, but because the route was evaluated at 42:42 weekly standard hours, there was no available option election.  Thus, the route was automatically a 43H Route.  Although Bell chose the high option, the number of standard hours, according to the table of evaluated hours, precluded that option.  SUF 50 (Schmidt Dec. ¶ 32).  According to Dev, however, Bell did not choose the high option, but instead Smith gratuitously granted it to Bell.  No evidence is cited for that assertion.  Dev further surmises that when management realized that Bell (a white employee) did not qualify for the high option, management also took

1    the high option from Dev.  Dev also says that Smith signed Bell's high option request, but used a

2    supervisor to sign Dev's so that she could say that Dev's was invalid as unsigned by Smith.

3    RSUF 50 (Pl.'s Exs. 42, 43).

4         Rural Route 8 was counted during the 2010 National Count.  SUF 52 (Schmidt Dec. ¶ 27);

5    RSUF 52.  No other rural carrier requested high option for a route to which he or she was not

6    assigned during the 2010 National Count.  SUF 51 (Smith Dec. ¶ 24); RSUF 51.

7         The Postmaster conducted two pre-count conferences in advance of the 2010 National

8    Count – one on February 11, 2010, and one on February 12, 2010.  In addition, the Postmaster

9    had an individual meeting with one of the replacement carriers who carried Rural Route 8 during

10   the 2010 National Count (Ms. Jackson) to discuss count procedures.[10]  SUF 53 (Smith Dec. ¶ 29).

11   As discussed below, Dev asserts that the National Count results must be invalidated as to Route 8

12   because three other carriers did not attend the conference.

13        The Postmaster cannot compel carriers to attend a pre-count conference.  SUF 54 (Smith

14   Dec. ¶ 30); RSUF 54 (disputed as immaterial).  The replacement carriers who also carried on

15   Rural Route 8 during the 2010 National Count did not submit any questions or disputes during or

16   after the count.  SUF 55 (Smith Dec. ¶ 31); RSUF 55 (disputed as immaterial; adding that Dev

17   submitted disputes to Cutler and Smith during and after the National Count) (Dev Aff. ¶ 34).

18        Dev signed off on a Form 4241 on March 24, 2010, attesting to the accuracy of the count

19   data for Rural Route 8.  SUF 56 (Smith Dec. ¶ 32).  Dev admits that he signed the Form 4241 on

20   March 24, 2010, but disputes the remainder of the assertion with regard to the pre-count

21   conference.  RSUF 56.

22            C.    The Evaluation of Rural Route 8 in the 2010 National Count

23        Defendant has presented evidence that, as a result of the 2010 National Count, Rural

24   Route 8 was reclassified from a LK40 Route (evaluated at 40 hours with 2 paid relief days) to a

25   LJ41 Route (evaluated at 41 hours with 1 paid relief day).  SUF 57 (Schmidt Dec. ¶ 27).  Dev

26   contends that he moved to Route 8 because it was big and had the high option available on it.

27   _____

28   [10] Dev disputes this and contends there was only one pre-count conference.  RSUF 53 (Dev Aff.
     ¶ 32).

But, he says, the route was not counted properly; thus he says the National Count 2010 should have been "null and void" as to Route 8.  RSUF 57.  Dev pursued a grievance on this issue as well.  He alleged that the three replacement carriers who carried Rural Route 8[11] during the National Count did not attend a pre-count conference on February 11, 2010.  SUF 58 (Smith Dec. ¶ 33); RSUF 58 (disputed as immaterial).  Therefore, according to Dev, the route could not have been properly counted during the National Count.  RSUF 58.

The Union took the following position as to the grievance:

> Grievant states that the leave replacement carriers who were involved in the count of RR8 were not invited to attend the pre-count conference, because of this the count data is wrong.  Grievant states that the mail count data is incorrect and management has made no attempt to correct it.  The dispute between the grievant and management is that the RCA's working RR8 before the regular being assigned to the route, was that the RCA's were not invited to the conference.  The mail count data is not being disputed.  The grievant was not on the Rural Route 8 during the 2010 mail count and this was a vacant route and was counted by Rural Carrier Associates.  Grievant had bid on Rural Route 8 and was awarded Rural Route 8 after the 2010 mail count.  Grievant signed the PS Form 4241 claiming that the count data is accurate.  The union contends that if there was a discrepancy during the 2010 mail count the items should have been corrected the day of the mail count.  The Grievant is filing this grievance for the RCA's that were working the route.  The grievant was not the regular on Rural Route 8 during the 2010 mail count and cannot file a grievance for another carrier.

Smith Dec. ¶ 33.

The grievance was settled between the union and the Postal Service on June 9, 2010, as follows: "Grievant was not the regular on Route 08 during the 2010 National Mail Count.  The grievant cannot provide proof that management did not follow proper procedure during or after the 2010 National Mail Count.  Since grievant was not assigned to Route 8 during the National 2010 Mail Count grievant has no dispute regarding the procedure of the 2010 mail count."  SUF 59-60 (Smith Dec. ¶ 34); RSUF 59-60.[12]

---

[11] Dev was still carrying Rural Route 16 during the National Count.

[12] Although not material to this motion, it is noted that as a result of the 2011 National Count, Rural Route 8 was evaluated to LH46 with no relief days within a 14 day pay period.  Schmidt Dec. ¶ 27.  Dev then elected high option on the route.  *Id.*

11

D.     Case Labels and Delivery Point Sequence (DPS)

Dev alleges that, on June 19, 2010, he was not provided with new case labels and that his Delivery Point Sequence ("DPS") was not put in the sequence that he wanted.[13]  SUF 61 (Compl. ¶¶ 193-204); RSUF 61.  Dev maintains that in April of 2010, he requested from two supervisors, David Cutler and Verenice Roubert, a new set of case labels and that his DPS be put in the sequence he desired.  SUF 62 (Compl. ¶¶ 196-97); RSUF 62.  Ms. Roubert recalls suggesting that Dev speak with Lisa Rodriguez, a city carrier with expertise at case labels and sequencing.  SUF 63 (Dec. of Verenice Roubert, ECF No. 55-11, ¶ 7); RSUF 63.  She also suggested to an employee in the Address Management Department that she and Dev speak directly about case labels and DPS.  SUF 64 (Roubert Dec. ¶ 9); RSUF 64 (disputed as immaterial).  According to Roubert, Dev's race, sex, national origin and color had nothing to do with the receipt of his case labels and when his DPS was put in his preferred sequence.  Roubert Dec. ¶ 12.

Dev received new case labels for his mail case and his DPS was put in the sequence that he wanted in approximately November of 2010.  SUF 65 (Olsen Dec. Ex. J (Dev Dep. at 191-92)); RSUF 65.

E.     Consolidation of Rural Routes 18 and 19

Rural Routes 18 and 19 became vacant in mid-March of 2010 – the carrier of Rural Route 18 vacated her route on March 13, 2010, for a full-time supervisor position and the carrier of Rural Route 19 resigned on March 22, 2010.  SUF 66 (Smith Dec. ¶ 41); RSUF 66.  According to the defendant, the collective bargaining agreement provides that when a route becomes vacant the

---

[13] Each rural carrier has a mail case (similar to a book case) used to sort mail in the order in which it will be delivered.  Smith Dec. ¶ 36.  The case has multiple slots, each having a label with the address for each customer on the route.  *Id.*  When the carrier arrives at work in the morning, he or she places the mail from trays and tubs of mail into his or her mail case.  *Id.*  When all the mail for the day is in the case, the carrier pulls the mail out of his or her case and places it in trays for transport and delivery that day.  *Id.*  The carrier also receives pre-sorted letters sorted under machine process known as the DPS.  *Id.* ¶ 37.  The DPS automated process puts letters in a sequence so that mail can be delivered in an efficient way.  *Id.*  Post offices report the order of their mail delivery routes to large processing facilities which then enter into a computer database individual addresses in the order in which mail is to be delivered.  *Id.*  Each day, mail is sent through the sorting equipment to place it into delivery order for individual rural carriers.  *Id.*  The pre-sorted mail is placed in mail trays and delivered each morning to individual post offices.  *Id.*  This pre-sorted mail can then be taken by rural carriers directly to the street for delivery.  *Id.*

12

1   Postmaster can either post the vacant route for bids or consider the route for consolidation.  SUF

2   67 (Schmidt Dec. ¶ 35).  Dev disputes that Smith had the discretionary power to do so, and

3   asserts that when a route becomes vacant, it must be posted within 30 days, and if consolidation is

4   pending, it has to be completed within 90 days.  RSUF 67.

5        On April 6, 2010, the Postmaster sent an email to the union steward and Sandra Schmidt

6   (the Postal Service's Rural Coordinator) informing them that she--the Postmaster--was planning

7   on consolidating the two routes in a manner by which the territory from these routes would be

8   given to substandard routes and to other routes in a way that would avoid having rural carriers

9   drive in and out of each other's route areas.[14]  SUF 68 (Schmidt Dec. ¶ 42).  Dev contends,

10   however, that Postmaster Smith lacked the authority to make the consolidation.  He also claims

11   that the consolidation of Routes 18 and 19 did not actually occur.  Instead, Dev contends that

12   Smith gave the territory to her favorites.  RSUF 68.

13        According to defendant, on May 25, 2010, the Postmaster notified all of the rural carriers

14   that if they were interested in obtaining some of the territory from these two rural routes, they

15   needed to notify her in writing.  SUF 69 (Schmidt Dec. ¶ 44).  Dev did not notify the Postmaster,

16   either in writing or orally, of his interest in any of the territory from Rural Routes 18 and 19.

17   SUF 70 (Smith Dec. ¶ 45; Olsen Dec. at Ex. J (Dev Dep. at 154-55)).  Dev does not specifically

18   dispute this but counters stating that he never "refused" to submit a request for additional territory

19   and that Smith personally invited the white employees to her office to submit requests for

20   additional territory.  RSUF 70.

21        The Postmaster asked Jamie Flanagan, a rural carrier from the Lincoln Post Office with

22   experience in rural route adjustments, to help her with the route adjustments of Rural Routes 18

23   and 19 following their consolidation because the Postmaster had never worked on a rural

24   adjustment before.  SUF 71 (Smith Dec. ¶ 46; Flanagan Dec. ¶ 5); RSUF 71 (disputed on the

25   ground that consolidation was not possible and therefore did not occur).  Flanagan is the daughter

26   of Annette Crabtree, a rural carrier and 204b supervisor at the Rocklin Post Office.  SUF 72

27

28   [14] A substandard route is a route with less than 40 standard hours per week. Schmidt Dec. ¶ 34.

13

(Flanagan Dec. ¶ 7); RSUF 72.  Plaintiff implies that because of the relationship some improper purpose was involved in either the assignment of Flanagan to this task, or Flanagan's influence on how the territory was divided and allocated.[15]  Plaintiff's precise point is not clear.  He states that "Ms. Fanagan is Ms. Crabtree's daughter.  Thus[,] Ms. Crabtree split the routes and gave the territory to their favorites."  Pl.'s Opp'n, ECF No. 101, at 32.  However, the only evidence plaintiff cites for this assertion is his own complaint.  Plaintiff also contends that Ms. Crabtree never assisted Ms. Flanagan in making any route adjustment decisions.  SUF 73 (Flanagan Dec. ¶ 8).  Dev contends that is not true, and that Crabtree and Flanagan worked jointly on the route adjustment project.  RSUF 73 (Dev Aff. ¶ 41).

According to the defendant, in making route adjustments, Ms. Flanagan looks only at route evaluations and make-up, not the carrier who is assigned to the route.  SUF 74 (Flanagan Dec. ¶ 12).  Dev disputes that and states that Flanagan improperly added territory to white employee John Casey's route (calculating the route as 46 substandard hours even though it was only worth 31 hours) and added territory to white employee Loren Bell's route, yet Flanagan under-calculated Dev's route.  RSUF 74 (Dev Aff. ¶¶ 42, 43).

Ms. Flanagan contends that as far as she is aware, she had never met Lal Dev before meeting him at her deposition in this case and did not know who he was until he filed the EEO complaints giving rise to this case.  SUF 75 (Flanagan Dec. ¶ 13).  Dev claims that is a lie and that Flanagan often came to the Rocklin office and worked on Dev's route and other routes as a substitute.  RSUF 75 (Dev Aff. ¶ 44).

The following rural carriers received territory following the consolidation of Rural Routes 18 and 19:

---

[15] Dev alleges that he filed a grievance challenging the distribution of territory from Rural Routes 18 and 19 as a conflict-of-interest.  Compl. ¶ 183.  He alleged that because Jamie Flanagan, a rural carrier from the Lincoln Post Office, is the daughter of a 204b supervisor at the Rocklin Post Office and Ms. Flanagan assisted the Rocklin Postmaster with route adjustments following the consolidation of Rural Routes 18 and 19, Ms. Flanagan had a conflict of interest and the distribution of territory from Routes 18 and 19 should be nullified.  *Id.*  Dev does not allege how his grievance was resolved, although it appears that the grievance was resolved against him because he alleges that the union representative "was accessory in this conspiracy" and "knowingly and willfully, falsified about everything."  *Id.*

Route 2 (Kimberly Powell – Caucasian, White, American, Female)
Route 3 (Sonny Pham – Asian, Brown, Vietnamese, Male)
Route 4 (Ramon Limon – Hispanic, Brown, Mexican, Male)
Route 5 (Oscar Bosch – Hispanic, Brown, Cuban-American, Male)
Route 6 (John Bucciarelli – Caucasian, White, American, Male)
Route 10 (Vicki Ardoin – Caucasian, White, American Female)
Route 11 (Annette Crabtree – Caucasian, White, American, Female)
Route 12 (Mary Grace Carlton – Caucasian, White, American, Female)
Route 14 (John Adama – Asian, Brown, Philippino-American, Male)
Route 17 (Kimberly Ratkowski – Caucasian, White, Indian-American, Female)
Route 20 (Suzanne Smith – Caucasian, White, American, Female)

SUF 76 (Smith Dec. ¶ 48); RSUF 76.

The following rural carriers did not receive territory following the consolidation of Rural

Routes 18 and 19:

Route 1 (Oleg Tysrul – Caucasian, White, Russian, Male)
Route 7 (Mei Chen – Asian, Brown, Chinese, Female)
Route 8 (Lal Dev – Asian, Brown, Indian, Male)
Route 9 (John Casey – Caucasian, White, American, Male)
Route 13 (Kenneth Manning – Caucasian, White, American, Male)
Route 15 (Loren Bell – Caucasian, White, American, Male)
Route 16 (Louis Dematos – Hispanic, Brown, American, Male)

SUF 77 (Smith Dec. ¶ 49); RSUF 77.

F.      204b Temporary Supervisor Position

Dev alleges that on January 19, 2011, he reported to work at the Rocklin Post Office and

discovered Annette Crabtree, a rural letter carrier, "sitting on the supervisor chair."  Compl.

¶ 225.  He then discovered that Ms. Crabtree was serving as a 204b supervisor, despite the fact

that "I had come across her ill characteristics, and I had reported her unworthiness for the position

to Ms. Smith."  *Id.* ¶ 226.

A 204b supervisor is an individual who fills in as an acting supervisor on an as needed

basis when the supervisory staff is shorthanded.  SUF 78 (Smith Dec. ¶ 51; Schmidt Dec. ¶ 36);

RSUF 78 (Pl.'s Ex. 66 (Walters Dep. at 11-12)).  A 204b supervisor may be supervising for the

day, two days, a week or a few hours as needed.  Dec. of Efren Diaz, ECF No. 55-7, ¶ 3.  A 204b

supervisor in the rural craft has to be assigned as acting supervisor for at least 30 days before he

or she can be paid at the higher level as a supervisor.  SUF 79 (Diaz Dec. ¶ 4); RSUF 79.

Although Dev never applied for the position, he insists that "Ms. Grewal [the Manager of

Post Office Operations] and Ms. Smith were well aware about my interest for the higher level

1    supervisor position for a long time, yet they never gave me an opportunity."  Compl. ¶ 227.  He

2    states that he has seniority over other Postal Service employees who were given 204b

3    assignments or who were offered 204b assignments, such as Annette Crabtree, Kimberly Hayes,

4    Jose Martinez, Daisy [Amandeep] Spring, and Sukhcain Aulakh.  *Id.* ¶ 228.

5         Defendant contends that Smith instructed Dev that he needed to make a request in writing

6    if he were interested in a 204b supervisor position and that Dev never did.  SUF 80 (Smith Dec.

7    ¶ 53).  According to defendant, Dev never submitted a written request to be considered for a 204b

8    supervisor position, SUF 81 and Smith Dec. ¶ 53, and never submitted a PS Form 991,

9    Application for Promotion or Assignment for consideration as a 204b supervisor.  SUF 82.  Dev

10    offers a number of explanations for not doing so.  ECF No 55-5 (Olsen Dec. Ex. J (Dev Dep. at

11    209) (explaining his failure to submit a PS Form 991 as follows: "A. I did not submit because

12    there is another guy submit 991 for several years and it is rottening.  Q. Just gathering dust?  A.

13    Yeah. . . .")).  Dev also asserts that Smith never instructed him to make a request in writing.

14    RSUF 80 (Dev Aff. ¶ 47).  Dev further contends that he never refused to submit a written request;

15    that Smith asked carriers Amandeep Spring and Jose Martinez to submit requests in writing; that

16    Smith offered the 204b position to Mr. Aulakh without his written request; and that Smith never

17    asked for or offered the supervisor position to Dev.  RSUF 81 (Dev Aff. ¶¶ 48-50).  Dev also

18    claims that he did not submit a Form 991 because the notice of vacancy needs to be posted for 15

19    days for a Form 991 to be submitted and Smith did not post a vacancy notice.  RSUF 82 (Dev

20    Aff. ¶ 51).  Further, Dev argues that Smith appointed Kimberly Hayes, a white female employee,

21    to a 204b position with just a high school diploma, and Smith kept Crabtree a 204b supervisor for

22    more than a year, even though Smith could not produce her Form 991 or Form 1723, despite

23    Dev's discovery requests.  *Id.* ¶ 52.

24         The following individuals have served as 204b supervisors in the Rocklin Post Office in

25    the last three years: Annette Crabtree (Caucasian, White, Female); Amandeep Spring (Asian

26    Indian, Brown, Female); Jose Martinez (Hispanic, Brown, Male); Ronna Williams (Caucasian,

27    White, Female).  SUF 83 (Smith Dec. ¶ 54); RSUF 83.  Dev adds that all of these persons are

28    females except Martinez, who was only appointed after complaining to a district manager; and

1   adding that the list should also include Kimberly Hayes (Caucasian, White, Female).  Dev Aff.

2   ¶ 53.  Dev also contends that none of those people submitted a Form 991.  Pl.'s Stmt. of Disp.

3   Facts, ECF No. 101 at 75, ¶ 7 (citing only Dev's complaint and no evidence)).

4        Smith also offered a 204b supervisor to Sukhchain Aulakh (Asian Indian, Brown, Male),

5   but Mr. Aulakh declined the position.  SUF 84 (Smith Dec. ¶ 54); RSUF 84 (disputed as

6   immaterial and adding an assertion that Smith offered the position to Aulakh to cover up her

7   discriminatory animus).  Ms. Crabtree had worked as a 204b supervisor since before Smith came

8   to the Rocklin Post Office and had demonstrated her ability to perform the functions of a 204b

9   supervisor.  SUF 85 (Smith Dec. ¶ 55); RSUF 85 (admitting that Crabtree worked for years as a

10  204b supervisor, but disputing her performance abilities).  Also, Ms. Williams was asked to serve

11  as a 204b supervisor by the Manager of Post Office Operations, not Smith.  SUF 86 (Olsen Dec.

12  Ex. N (Ronna Williams Dep. at 13)); RSUF 86 (disputing as immaterial and stating that the letter

13  of appointment shows that Smith had the hiring authority).

14        G.    Administrative Proceedings

15             1.    Agency Case No. 4F-956-0099-10

16        Dev filed a formal EEO complaint of discrimination on September 27, 2010, alleging

17  discrimination on the basis of race, color, national origin, and gender when: (1) he was denied

18  high option on Rural Route 8; (2) Rural Route 8 was incorrectly evaluated during the 2010

19  National Count; (3) the Postmaster did not give him any additional territory on Rural Route 8

20  after the Postmaster consolidated Rural Routes 18 and 19 and distributed the territory from those

21  two routes to various other rural carriers; (4) he did not receive updated case labels and his

22  Delivery Point Sequence ("DPS") was not put in proper sequence in a timely manner after he

23  began carrying Rural Route 8; and (5) the Postmaster humiliated him on the work floor and

24  created a hostile work environment.  Olsen Dec. Ex. B, ECF No. 55-4.

25        The Postal Service conducted an EEO investigation and prepared an EEO Investigation

26  Report on January 8, 2011.[16]  An EEOC Administrative Judge thereafter issued a decision on

27  ─────────────

28  [16] The Postal Service accepted for investigation the issues Dev raised in his EEO complaint
    regarding high option on Rural Route 8 and the distribution of territory from Rural Routes 18 and

17

1   August 29, 2011, granting summary judgment in favor of the Postal Service. *Id*. Ex. E.  The

2   Postal Service issued its Notice of Final Agency Action implementing the Administrative Judge's

3   decision on September 8, 2011.  *Id*. Ex. F.

4                   2.          Agency Case No. 4F-956-0047-11

5           Dev filed a second formal discrimination complaint, dated March 11, 2011, alleging

6   discrimination on account of race (Asian-American), color (Brown) and sex (Male) when, on

7   January 19, 2011, he was denied a detail to a higher level 204b position.  *Id*. Ex. G.  The Postal

8   Service conducted an EEO investigation and prepared an EEO Investigation Report on June 17,

9   2011.  Dev requested a final agency decision on the merits of his complaint rather than a hearing

10  before an EEOC Administrative Judge and, on August 17, 2011, the Postal Service issued a Final

11  Agency Decision finding no discrimination.  *Id*. Ex. H.

12      III.    PLAINTIFF'S MISCELLANEOUS MOTIONS

13          Dev filed multiple miscellaneous motions in response to the motion for summary

14  judgment.  Essentially, Dev seeks to exclude nearly every item of evidence submitted by the

15  defendant on the motion for summary judgment.  Dev's motions include:  motions to strike the

16  declarations of Cheri Smith, ECF Nos. 71, 77, 78, 82; a motion to strike the declaration of Sandra

17  Schmidt, ECF No. 73; a motion to strike the declarations of Efren Diaz, Verenice Roubert, and

18  Jamie Flanagan, ECF No. 76; a motion to add defendants, ECF No. 83; and a motion to strike the

19  declaration of Edward A. Olsen, ECF No. 86.

20              A.      Motions to Strike Declarations of Cheri Smith

21          Dev moves to strike two declarations from Cheri Smith.  ECF Nos. 71, 77, 78, 82 (seeking

22  to strike ECF Nos. 58 and 79).  Dev argues, *inter alia*, that various paragraphs in Ms. Smith's

23  February 27, 2013 declaration, ECF No. 58, lack foundation, lack personal knowledge, are

24  confusing, argumentative, and vague, contain improper hearsay, and are irrelevant.  ECF Nos. 71,

25  77, 78.  Dev also contends generally that the declaration is a "sham" since Dev disagrees with the

26  _____

27  19, but dismissed the issues Dev raised regarding a hostile work environment, nullification of
    route evaluation, and case labels/DPS sequence, on the ground that these events did not constitute
    adverse actions.  ECF No. 55-4, Olsen Dec. Ex. C. The EEOC Administrative Judge concurred in

28  the Postal Service's dismissal of those issues.  *Id*. Ex. D.

1    statements made therein.  None of Dev's evidentiary objections to Ms. Smith's declarations have

2    merit.  The declarations by Smith have an adequate foundation, are based on her personal

3    knowledge and address relevant facts.  The fact that they include testimony unhelpful to Dev does

4    not render that testimony inadmissible for purposes of summary judgment.  Dev's motion to

5    strike Smith's February 27, 2013 declaration is denied.  Dev also seeks to strike Smith's March

6    29, 2013 declaration, ECF No. 79, arguing, *inter alia*, that the declaration was not authorized and

7    is a sham.  ECF No. 82.  That objection is also denied.

8                    B.        Motion to Strike Declaration of Sandra Schmidt

9         Dev also moves to strike the declaration of Sandra Schmidt.  ECF No. 73.  Dev argues

10   that various paragraphs in Ms. Schmidt's February 25, 2013 declaration, ECF No. 55-9, attempt

11   to create new issues of material fact, are untrue, lack foundation and personal knowledge, are

12   argumentative, are vague, improperly amount to expert testimony, and are irrelevant.  Dev

13   contends the entire declaration was drafted with the "intent to deceive."  ECF No. 73 at 3-6.

14   Again, Dev's objections lack merit.  Like Smith's declarations, the Schmidt declaration also

15   includes an adequate foundation, is based on her personal knowledge and addresses relevant facts.

16   Dev's motion to strike it is denied.

17                   C.        Motion to Strike the Declarations of Efren Diaz, Verenice Roubert, Jamie

18                             Flanagan

19        Dev also moves to strike portions of the declarations of Efren Diaz, Verenice Roubert,

20   Jamie Flanagan.  ECF No. 73.  Dev argues, *inter alia*, that paragraphs 3 and 4 of the Diaz

21   declaration lack foundation, contain hearsay, contain expert testimony, are irrelevant, and lack

22   foundation.  The objections lack merit and are overruled.

23        Dev also contends paragraph 12 of the Roubert declaration lacks foundation, contains

24   improper expert opinion and speculation, and contains an improper opinion on the ultimate issue

25   of law.  Dev further contends that several paragraphs in the Flanagan declaration lack foundation,

26   contain hearsay, are false, contain improper expert opinion, and contain an improper opinion on

27   the ultimate issue of law.  Those objections also lack merit and are overruled.

28   /////

                                                    19

1    Accordingly, Dev's motion to strike the declarations of Efren Diaz, Verenice Roubert, and

2    Jamie Flanagan is denied.

3                    D.      Motion to Strike Declaration of Edward A. Olsen

4    Dev also moves to strike the entire declaration of Edward Olsen, which authenticates

5    several of the exhibits filed in support of defendant's motion, arguing *inter alia* that it improperly

6    seeks to introduce evidence into the record.  ECF No. 86.  The argument is meritless and Dev has

7    not shown that Olsen's declaration should be stricken.  Nor has Dev shown that various exhibits

8    attached to his declaration should be stricken.  Therefore, that motion is denied.

9    Within the motion to strike the Olsen declaration is a request to strike Exhibit K thereto

10   which is a copy of defendant's responses to Dev's Requests for Admission ("RFA") and a proof

11   of service indicating that the responses were served on Dev on May 4, 2012 via mail and email.

12   On July 3, 2012, Dev filed a motion to have the requests for admission be deemed admitted

13   pursuant to Federal Rule of Civil Procedure 36(a)(3).  ECF No. 27.  Specifically, Dev contends

14   that he served defendant with a first set of requests for admission on April 5, 2012, and that

15   defendant failed to respond thereto.  *Id*. at 2.  On July 10, 2012, the court issued an order stating

16   the following:

17
         If in fact Dev properly served defendant with requests for admission and
18       defendant failed to respond, pursuant to Rule 36(a)(3), those requests for
         admission are automatically deemed admitted.  No motion is needed.  *See* Fed. R.
19       Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served,
         the party to whom the request is directed serves on the requesting party a written
20       answer or objection addressed to the matter and signed by the party or its
         attorney."); *see also Fed. Trade Comm. v. Medicor LLC*, 217 F. Supp. 2d 1048,
21       1053 (C.D. Cal. 2002) ("No motion to establish the admissions is needed because
         Federal Rule of Civil Procedure 36(a) is self executing.").  Accordingly, Dev's
22       motion, Dckt. No. 27, is denied as unnecessary and the July 18, 2012 hearing
         thereon is vacated.
23

24   ECF No. 28.  From this, Dev argues that the court has already found that the RFAs have been

25   admitted and therefore the exhibit must be stricken.  The argument is disingenuous.

26   Dev's reading of that order would omit the first three words "[i]f in fact" and construe the

27   language as a finding that the responses were not served and that Dev's RFAs are automatically

28   deemed admitted.  With that mischaracterization of the order Dev contends that Exhibit K must

                                                    20

1    be stricken.  Obviously, Dev misstates the court's order.

2         Dev further contends that the defendant's responses to his RFA were not, in fact, served

3    by mail.  He contends that Olsen does not have personal knowledge of their service since it was

4    Karen Clark who signed the proof of service.  ECF No. 86 at 20-21.  Dev also argues that the

5    proof of service was improper since it was not signed under penalty of perjury.  *Id.* at 21.

6         Defendant responds noting that Dev arguments for why he believes the RFAs should be

7    deemed admitted do not provide a basis for striking the exhibit.  The point is well-taken.  Dev

8    may contest whether the certificate of service is technically correct, or whether the emailed copy

9    did or did not constitute a proper form of service, but those arguments do not provide a basis for

10   striking the defendant's evidence.  Defendant further responds that even if the court were to

11   determine that Dev's First Set of RFAs should be deemed admitted on the ground that

12   defendant's responses were not sent out by mail on May 4, 2012, the defendant seeks leave to

13   withdraw the deemed admissions pursuant to Fed. R. Civ. P. 36(b).[17]  Defendant argues that

14   withdrawal of the deemed admissions would promote the presentation of the merits of the action

15   and argues that Dev will not suffer any prejudice.

16        As an initial matter, although Dev contends that the 190 RFA responses were not mail-

17   served notwithstanding the clear statement in the certificate of service that they were, Dev has not

18   adequately established that the responses were not mailed.  Rather, he summarily discounts the

19   statement in the certificate of service with the bald allegation that the certifying individual simply

20   lied.  No evidence is produced in support of that allegation and Dev provides no credible reason

21   why the other mail (and email) from defendant was received but not these responses.  Dev

22   similarly claims the Mr. Olsen has not been truthful in his declaration where he states that he also

23   emailed the responses to Dev and then followed up with another mail-served copy on July 26,

24   2012.  Olsen Dec., ECF No. 55-3, ¶¶ 13, 14.  Dev's repeated dismissal of these representations to

25   the court as lies with no evidence to support these ad hominem attacks is inappropriate and

26   _____
     [17] As it relates to withdrawal of deemed admissions, Rule 36(b) provides that "[s]ubject to Rule
27   16(e), the court may permit withdrawal or amendment if it would promote presentation of the
     merits of the action and if the court is not persuaded that it would prejudice the requesting party
28   in maintaining or defending that action on the merits."  Fed. R. Civ. P. 36(b).

                                                 21

1    merely detracts from the other issues raised in the motion for summary judgment.  Regardless,

2    even if the court assumes the responses to the RFA were not mail-served or emailed-served on

3    time, as explained below, the defendant has met his burden under Federal Rule of Civil Procedure

4    36(b) of showing that withdrawal of any automatic deemed admissions permits consideration of

5    the claims on the merits and does not prejudice the plaintiff.

6                      E.       Withdrawal of Admissions Under Rule 36(b)

7            A party may withdraw or amend an admission if the court finds that withdrawal will aid in

8    presenting the merits of the case; and no substantial prejudice to the party who requested the

9    admission will result from allowing the admission to be withdrawn or amended.  Fed. R. Civ. P.

10   36(b); *see Conlon v. United States*, 474 F.3d 616, 625 (9th Cir. 2007) (court must consider both

11   factors in deciding motion to withdraw or amend).  The court so finds here.

12           With regard to the first factor, assuming *arguendo* that defense counsel did not timely

13   mail serve the responses, and that failure results in all of the RFAs being deemed admitted,

14   withdrawal of those admissions would aid in presenting the merits of the case since the 190

15   admissions would largely eliminate the need for presentation on the merits of key factual disputes

16   underlying Dev's claims and would not serve the truth-seeking goal of litigation.

17           Additionally, with regard to the second factor, Dev has not shown that he would be

18   substantially prejudiced by a withdrawal of the admissions.  Substantial prejudice is not shown

19   simply because the admitted fact would have to be proved.  Rather, some increased difficulty in

20   proving the previously admitted fact (e.g., unavailability of witnesses, etc.) must be shown.

21   *Sonoda v. Cabrera*, 255 F.3d 1035, 1039 (9th Cir. 2001); *Perez v. Miami–Dade County*, 297 F.3d

22   1255, 1264  (11th Cir. 2002) (error to deny leave where no substantial prejudice shown, even if

23   motion untimely); *Conlon*, 474 F.3d at 623–24 (The prejudice must relate to the difficulty the

24   opposing party may face in proving its case at trial.  Therefore, reliance on a deemed admission in

25   preparing a summary motion does not, by itself, constitute sufficient prejudice to justify denial of

26   a motion to withdraw or amend the admission.); *but see Conlon*, 474 F.3d at 624 (lack of

27   discovery may constitute prejudice where trial is imminent and the opposing party is relying on

28   the admissions to prove its case at trial, and would have to seek a continuance of the trial date,

                                                      22

1    which may or may not be granted). Here, as defendant notes, Dev would not be prejudiced in the

2    presentment of his case at trial if any deemed admissions are withdrawn. While Dev denies it, he

3    has presented no evidence to show that he can seriously dispute that, at a minimum, defense

4    counsel emailed his Responses to Dev's First Set of RFAs to Dev on May 4, 2012 (within 30

5    days of service of the RFAs). Further, the defendant sent another copy of his responses to

6    Plaintiff's First Set of Requests for Admission to Dev on July 26, 2012. Whatever brief delay

7    Dev experienced in obtaining the responses has not resulted in legal prejudice to his ability to

8    present his claims. Moreover, fact discovery in this case did not close until January 25, 2013.

9    Although Dev contends that he would be prejudiced by the withdrawal of the admissions because

10   it affected his deposition strategy, ECF No. 112, even if the responses were not properly mail-

11   served, at the very least, Dev had an email copy and a mail copy of the RFA responses shortly

12   after they were due. Therefore, any deemed admission is properly withdrawn.

13          For all of these reasons, Dev's motion to strike the Olsen declaration is denied.

14                  F.      Motion to Add Defendants

15          Dev also moves to add Rocklin Postmaster Smith and District Rural Coordinator Schmidt

16   as defendants, arguing that their acts are the central focus of this litigation and that they are

17   necessary parties under Rule 19. ECF No. 83. However, the only proper defendant in a Title VII

18   action is "the head of the department, agency, or unit, as appropriate." ECF No. 87 (citing 42

19   U.S.C. § 2000e-16(c); *Sommatino v. United States*, 255 F.3d 704, 707 n.1 (9th Cir. 2001) ("In a

20   Title VII action, the proper defendant is the head of the department, agency, or unit, as

21   appropriate."); *Williams v. Gen. Servs. Admin.*, 905 F.2d 308, 311 (9th Cir. 1990) ("[W]here a

22   federal employee pursues a Title VII claim against the government, he is precluded from asserting

23   discrimination claims against individual federal employees who may have participated in the

24   case."); *Romain v. Shear*, 799 F.2d 1416, 1418 (9th Cir. 1986) (per curiam) ("Title VII thus

25   requires that in a suit such as Romain's, the Secretary of Transportation be named as the

26   defendant."); *White v. Gen. Servs. Admin.*, 652 F.2d 913, 916 n.4 (9th Cir. 1981) ("Title VII

27   provides that actions based upon federal employment discrimination are to be brought against the

28   director of the agency concerned.")). Under Title VII, individuals are not subject to liability. *See*

1   *Greenlaw v. Garrett*, 59 F.3d 994, 1001 (9th Cir. 1995) ("Under Title VII, there is no personal

2   liability for employees, including supervisors such as McMillin."); *Miller v. Maxwell's Int'l Inc.*,

3   991 F.2d 583, 587-88 (9th Cir. 1993) (same).

4        In a case against the USPS, the Postmaster General is deemed the only proper defendant.

5   *See Mahoney v. U.S. Postal Service*, 884 F.2d 1194, 1196 (9th Cir. 1989); s*ee also Melcher v.*

6   *U.S. Postal Service*, 2012 WL 3276985, at *4 (N.D. Cal. Aug. 9, 2012) ("The proper defendant in

7   a Title VII case involving a federal employee is the head of the agency or department.  42 U.S.C.

8   § 2000e–16(c)").  The current head of the United States Postal Service, Patrick Donahoe, is the

9   only proper defendant in this Title VII action.  Neither Cheri Smith nor Sandra Schmidt is "the

10   head of the department, agency, or unit, as appropriate," 42 U.S.C. § 2000e-16(c), and neither

11   would be a proper defendant in this case.  Therefore, the motion to amend must be denied.

12       IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

13        Finally, having disposed of Dev's myriad of motions, the court addresses the motion for

14   summary judgment.

15       A.    Summary Judgment Standard

16        Summary judgment is appropriate when it is demonstrated that there exists "no genuine

17   dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed.

18   R. Civ. P. 56(a).  Under summary judgment practice, the moving party always bears the initial

19   responsibility of informing the district court of the basis for its motion, and identifying those

20   portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

21   together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

22   of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P.

23   56(c)).[18]

24        Summary judgment avoids unnecessary trials in cases with no genuinely disputed material

25   facts.  *See N.W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At

26   _____

27   [18] Although the court in *Celotex* cites to Federal Rule of Civil Procedure 56(c) for
the basic summary judgment standard, that standard was moved to Rule 56(a) in the 2010
amendments to the Rules.  *See* 2010 Amendment notes following Fed. R. Civ. P. 56, effective

28   December 1, 2010.

1    issue is "whether the evidence presents a sufficient disagreement to require submission to a jury

2    or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty*

3    *Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Thus, Rule 56 serves to screen the latter cases from

4    those which actually require resolution of genuine disputes over material facts; e.g., issues that

5    can only be determined through presentation of testimony at trial such as the credibility of

6    conflicting testimony over facts that make a difference in the outcome.  *Celotex*, 477 U.S. at 323.

7         Focus on where the burden of proof lies as to the issue in question is crucial to summary

8    judgment procedures.  "[W]here the nonmoving party will bear the burden of proof at trial on a

9    dispositive issue, a summary judgment motion may properly be made in reliance solely on the

10   'pleadings, depositions, answers to interrogatories, and admissions on file.'"  *Id.*  Indeed,

11   summary judgment should be entered, after adequate time for discovery and upon motion, against

12   a party who fails to make a showing sufficient to establish the existence of an element essential to

13   that party's case, and on which that party will bear the burden of proof at trial.  *See id.* at 322.  In

14   such a circumstance, summary judgment should be granted, "so long as whatever is before the

15   district court demonstrates that the standard for entry of summary judgment, as set forth in Rule

16   56([a]), is satisfied."  *Id.* at 323.

17        If the moving party meets its initial responsibility, the opposing party must establish that a

18   genuine issue as to any material fact actually does exist.  *See Matsushita Elec. Indus. Co. v.*

19   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To overcome summary judgment, the opposing

20   party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the

21   claim under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pac. Elec.*

22   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and genuine, i.e., the evidence is such that

23   a reasonable jury could return a verdict for the nonmoving party.  *See Wool v. Tandem*

24   *Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).  In this regard, "a complete failure of proof

25   concerning an essential element of the nonmoving party's case necessarily renders all other facts

26   immaterial."  *Celotex*, 477 U.S. at 323.   In attempting to establish the existence of a factual

27   dispute that is genuine, the opposing party may not rely upon the allegations or denials of its

28   pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

25

admissible discovery material, in support of its contention that the dispute exists.  *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the opposing party must demonstrate with adequate evidence a genuine issue for trial.  *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 248, 252.  If the evidence presented could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*; *Celotex*, 477 U.S. at 323.

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

B.    Analysis

Dev alleges discrimination on account of race, color, national origin, and sex in violation of Title VII of the Civil Rights Act.  42 U.S.C. § 2000e-2(a)(1); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825, 829, 834-35 (1976).  An employee may show violations of Title VII by proving

26

1    disparate treatment, a hostile work environment, or retaliation for protected activities.  To

2    establish a prima facie case of disparate treatment under Title VII, plaintiff must introduce

3    evidence that "give[s] rise to an inference of unlawful discrimination."  *Yartzoff v. Thomas*, 809

4    F.2d 1371, 1374 (9th Cir. 1987) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S.

5    248, 253 (1981)).  A plaintiff may do so by demonstrating that (1) he is a member of a protected

6    class, (2) he was performing his job in a satisfactory manner, (3) he suffered an adverse

7    employment decision, and (4) he was treated differently than similarly situated persons outside

8    his protected class.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

9       If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to

10    articulate a legitimate, non-discriminatory reason for its decision.  *Manatt v. Bank of Am., N.A.*,

11    339 F.3d 792, 800 (9th Cir. 2003).  Once an employer does so, the plaintiff bears the burden of

12    proving that the articulated reason was merely a pretext for a discriminatory motive.  *Id*.; *Costa v.*

13    *Desert Palace, Inc*., 299 F.3d 838, 856 (9th Cir. 2002) (en banc) (citing *Price Waterhouse v.*

14    *Hopkins*, 490 U.S. 228, 260 (1989)).

15       Plaintiff can demonstrate pretext by "directly persuading the court that a discriminatory

16    reason more likely motivated the employer[,] or indirectly by showing that the employer's

17    proffered explanation is unworthy of credence."  *Stegall v. Citadel Broad. Co*., 350 F.3d 1061,

18    1066 (9th Cir. 2003) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)

19    (citation omitted)).  "'Direct evidence is evidence which, if believed, proves the fact [of

20    discriminatory or retaliatory animus] without inference or presumption.'"  *Godwin v. Hunt*

21    *Wesson, Inc*., 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting *Davis v. Chevron, U.S.A., Inc*., 14

22    F.3d 1082, 1085 (5th Cir. 1994)).  "When the plaintiff offers direct evidence of discriminatory

23    motive, a triable issue as to the actual motivation of the employer is created even if the evidence

24    is not substantial."  *Godwin*, 150 F.3d at 1221.  In contrast, when direct evidence is unavailable,

25    and the plaintiff proffers only circumstantial evidence that the employer's motives were different

26    from its stated motives, plaintiff must show "specific" and "substantial" evidence of pretext to

27    survive summary judgment.  *Id*. at 1222.

28    /////

1    In applying the *McDonnell Douglas* and *Burdine* shifting burdens analysis, the starting

2    point is whether plaintiff has produced sufficient evidence to establish a *prima facie* case.  The

3    Ninth Circuit has noted that "[a] plaintiff alleging employment discrimination 'need produce very

4    little evidence in order to overcome an employer's motion for summary judgment.  This is

5    because the ultimate question is one that can only be resolved through a searching inquiry-one

6    that is most appropriately conducted by a factfinder, upon a full record.'"  *Davis v. Team Elec.*

7    *Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal citations omitted); *See also Peterson v.*

8    *Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (quoting *Forsberg v. Pac. Northwest*

9    *Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988)).

10    Here, Dev's action is based on six events: (1) denial of the high option on Rural Route 8;

11    (2) incorrect evaluation of Rural Route 8 during the 2010 National Count; (3) the Postmaster not

12    giving Dev additional territory on Rural Route 8 upon consolidation of Rural Routes 18 and 19;

13    (4) not receiving new case labels and DPS placement in the sequence he wanted in a timely

14    manner after he began carrying Rural Route 8; and (5) denial of a detail to a temporary supervisor

15    position referred to as a "204b position."[19]  Dev has not adduced any direct evidence of

16    discrimination, such as blatant remarks, racial epithets or derogatory comments.  *See EEOC v.*

17    *Boeing Co.*, 577 F.3d 1044, 1049 (9th Cir. 2009).  While Dev contends that he was denied the

18    high option because of his sex, race and color, he has not introduced any "sexist, racist, or

19    similarly discriminatory statements or actions" by defendant suggesting he was denied the high

20    option because of his race, color, national origin, or sex.  *Coghlan v. Am. Seafoods Co. LLC*, 413

21    F.3d 1090, 1095 (9th Cir. 2005).  However, Dev may attempt to establish discrimination under

22    the *Burdine* burden-shifting test by showing a *prima facie* case of disparate treatment and that the

23    defendant's legitimate non-discriminatory reasons for the disparate treatment are pretextual.

24    As discussed in detail below, Dev has not produced evidence sufficient to establish a

25    genuine dispute as to any material issue of fact.  In most of his claims he fails to demonstrate the

26

27    ───────────────

[19] In Claims 1, 2, and 6, Dev alleges that he was subjected to discrimination on account of sex, race, and color.  Compl. ¶¶ 28, 59, 220.  In Claims 3 and 4, Dev alleges that he was subjected to

28    discrimination on account of sex, race/color, and national origin.  *Id.* ¶¶ 89, 193.

1   threshold requirement of disparate treatment in connection with the events he alleges to be

2   discriminatory.  In all of his claims he fails to provide evidence that can show that the defendant's

3   non-discriminatory explanations for the actions it took are false and merely a pretext for

4   discrimination.

5                            1.      Denial of high option on Rural Route 8

6                                    a.      Prima Facie Case

7          A fundamental barrier to Dev's claims regarding "high option" is the fact that he cannot

8   demonstrate that any similarly-situated rural letter carriers outside of his protected class were

9   treated more favorably than he; a prerequisite for establishing a *prima facie* case.  Dev notes that

10  he is a member of a protected class, which is undisputed.  He argues that his work performance is

11  in accordance with his employer's expectations and that initially denying the high option on

12  Route 8 amounted to an adverse employment action.  However, Dev fails to present evidence

13  upon which a reasonable fact-finder could reasonably conclude that he was subjected to disparate

14  treatment.

15         As noted, the point of the high option is to elect more work on a route for more pay.  The

16  pay for a carrier is based on the size of the route, the length and the density, and the average mail

17  that's delivered as is determined by a mail count.  A carrier has the opportunity to choose the high

18  or the low option.  Choosing the high option will result in more work, but it will also result in

19  more pay.  According to the rules as understood by the Postmaster at the time, option elections

20  were available, but they were available only during the time period that a national count was

21  occurring.  For 2010, that period was February 27, 2010, through March 12, 2010.  Here, Dev's

22  assignment to Route 8 was March 13, 2010.

23         In February 2010, Dev was assigned to Route 16.  He applied for Route 8 which had been

24  posted as a low option.  As noted, accepting a low option would result in less work but less pay.

25  Plaintiff's application was successful.  He was selected, but he then decided that he did not want

26  the low option.  He says that when he learned that he could not get the higher option he filed a

27  grievance.

28  /////

29

1    During the grievance process, the union and the postal service both acknowledged that

2    when Dev bid on Route 8 it was clearly advertised as a low option.  They also acknowledged that

3    Dev was not in a period where he could change to the high option, at least according to the

4    understanding of the rules by both the Union and the Postmaster.  They further acknowledged that

5    Dev had time to withdraw his bid if he did not want to take a low option route but nonetheless

6    took the route.  Accordingly, both the union and the management agreed that Mr. Dev would have

7    to wait until an appropriate time (i.e. the next guarantee period commencing October 23, 2010) to

8    request a high option.  Therefore, the grievance was resolved with the determination that Route 8

9    had been properly posted at the low option, that plaintiff chose it anyway, and that plaintiff had

10   plenty of time to withdraw his bid if he did not want the low option but he failed to do so.

11    In opposition to this motion Dev repeats many of the arguments from his grievance.  He

12   contends that the posting for Rural Route 8 was late and that he should have been placed into the

13   route within 21 days from February 18, 2010, but he was not.  He contends that although he

14   started asking for the high option right after February 18, 2010, it was March 1, 2010, when he

15   formally asked for the high option from Supervisor Cutler.  According to Dev, he did not hear

16   anything for several days and on the morning of March 24, 2010 he asked Cutler about it.  He

17   claims that Cutler granted him the high option but a few weeks later told Dev that the high option

18   had been denied.  Dev says that he asked Smith about it and did not get an answer for several

19   more days.

20    On May 18, 2010, Dev got a copy of an email from Smith indicating that Dev had been

21   denied the high option.  Dev argues that had he been told on March 24, 2010 that he did not have

22   the high option, he could have filed a grievance regarding the late posting for Route 8, but by

23   May 18, 2010, he was over the time limit to file such a grievance.  Dev also argues that defendant

24   should be estopped from denying Dev the high option since defendant first granted Dev the high

25   option and then denied it later.

26    As a threshold matter, Dev's procedural arguments regarding his union grievances appear

27   to lose sight of the issue of whether there is any evidence that he was treated differently than

28   similarly-situated employees.  He argues at length over whether Rural Route 8 was properly

1   posted and filled in accordance with the Association's Agreement, and whether management has

2   properly interpreted that agreement.  Fundamentally, however, the issue in this Title VII action is

3   whether Dev was treated differently or discriminated against because of his race, color, sex, or

4   national origin--not whether defendant was correct or even wise in its management decisions.  *See*

5   *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (Title VII "only

6   require[s] that an employer honestly believed its reason for its actions, even if its reason is

7   'foolish or trivial or even baseless.'") (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733-34

8   (7th Cir. 2001)).  Thus, whether the local Postmaster was correct in her decisions or her

9   understanding of the union contract is not at issue here.[20]

10          Turning to the relevant question at this step, even assuming Dev satisfies the first three

11   requirements for a *prima facie* case of discrimination (that he is a member of a protected class,

12   was performing his job satisfactorily, and suffered an adverse action), Dev has failed to establish

13   the fourth requirement.  A reasonable jury could not find on the evidence presented here that

14   other similarly-situated rural carriers were treated differently than Dev with regard to the high

15   option.  Dev cites to three examples in which he allegedly was treated differently with regard to

16   the high option: (1) Kimberly Powell (Caucasian female) was granted high option and Dev was

17   not; (2) Loren Bell (Caucasian male) was granted high option; and (3) other female carriers were

18   granted high option without a Form 4241 being properly signed when Dev was not.  However,

19   scrutiny of each of the three defeats his claim of disparate treatment.  First, Powell was not

20   similarly situated to Dev.  Second, no reasonable juror could find on this record that Bell was

21   treated more favorably than Dev.  Third, Dev has not introduced any evidence of "other female

22   carriers" that were treated more favorably than him.  Last, even if a *prima facie* case is assumed

23   here, the defendant has submitted legitimate, non-discriminatory reasons for the denial and Dev

24   has not introduced any evidence to show that those reasons are simply a pretext.

25   /////

26

27   _____

   [20] Nor has Dev presented evidence that the Postmaster misapplied the union Agreement as to him
    because of racial animus or misapplied it as to Dev but did not do so as to other employees not
28   within plaintiff's protected class.

31

1                              (i).      Kimberly Powell

2              Dev claims in his opposition that Powell obtained the high option at the beginning of the

3     Guarantee Period (which began on October 23, 2010), while his request for the high option at the

4     beginning of the Guarantee Period was not approved until he filed a grievance.  ECF No. 101 at

5     28.  However, Powell was not similarly situated to plaintiff and provides no evidence of disparate

6     treatment.  First, she was not requesting a high option for a route she had just bid on knowing that

7     it had been posted as a low option.  Second, her request was made at the beginning of the

8     guarantee period, i.e., the 52-week time frame that began on October 23`, 2010.  Unlike Powell,

9     Dev's request was not at the beginning of the guarantee period.  According to the Rocklin

10    Postmaster's understanding of the union contract (and indeed the union's as well), a rural carrier

11    was not eligible for changing to the high option unless the request was made at the beginning of

12    the guarantee period.[21]

13             Rather than evidence of disparate treatment, the Powell example evidences similar

14    treatment.  She did not make a request to change to the high option during a time period that was

15    outside of the beginning of the guarantee period.  Rather, she requested it at beginning of the

16    guarantee period (i.e., October 23, 2010).  Likewise, when Dev made a request at the beginning

17    of the guarantee period (October 23, 2010), his request was ultimately granted.  In terms of the

18    outcome as to each employee, they appear to have been treated alike.  That Dev pursued a

19    grievance before he was able to obtain the high option does not alter that fact.

20             Dev asserted several claims in his grievances.  The vast majority lacked merit, but one

21    was sustained.  None demonstrate disparate treatment.  As a result of the 2010 national count

22    (which occurred in February through early March of 2010), Dev's route was reclassified on April

23    24, 2010 from a LK40 Route (evaluated at 40 hours with 2 paid relief days) to a LJ41 Route

24    (evaluated at 41 hours with 1 paid relief day).  Schmidt Dec. ¶ 27.  Dev pursued a grievance

25    seeking to "nullify" the evaluation of Rural Route 8 because three replacement carriers who had

26

27    [21] Although the Postmaster recently was informed that her understanding was incorrect, as
      discussed below, the evidence before the court shows that the Postmaster's understanding of the
28    rule was applied equally to all employees, including the three examples plaintiff cites.

                                                        32

1   carried Rural Route 8 during the 2010 National Count had not attended the pre-count conference.

2   ECF No. 55-10 (Ex. C to Smith Dec.).  Although the theory for his challenge is not easily

3   understood, his position was that the route necessarily had not been properly counted because the

4   three replacement carriers did not attend the conference.  During that grievance process, the union

5   took the position that plaintiff was attempting to file a grievance on behalf of the other three

6   carriers which he could not do.  The Union also indicated that the plaintiff had signed a form

7   stating that the count was accurate.  Indeed, plaintiff had signed a Form 4241 on March 24, 2010,

8   attesting to the accuracy of the count data for Rural Route 8.  ECF No. 55-10 (Smith Dec ¶ 32).

9       The Union noted that Dev only raised the failure to invite to the pre-count conference the

10   three other carriers and that Dev had not disputed the accuracy of mail count data itself.

11   Ultimately, the grievance was resolved by the union and management with the determination that

12   the grievant had not established that proper procedures had not been followed and he had not

13   established that there was anything inaccurate about the 2010 mail count.

14       Finally, Dev pursued a grievance complaining that after he should have been given the

15   high option he reported to work on October 25, 2010 but a supervisor informed him that he was

16   not scheduled and that someone else worked the route in question.  As noted, *supra*, Dev was

17   allowed to elect the high option at the next guarantee period and it was made effective on October

18   23, 2010.  Thus, his supervisor on October 25 was plainly mistaken.  However, Dev's own exhibit

19   also shows that the Postmaster overruled that supervisor with the notation that "Carrier should be

20   paid, as new guaranteed period, carrier selected high option and [illegible] worked route."  ECF

21   No. 103, Pl.'s Ex. 44.  It is undisputed that Dev's high option was made effective on October 23,

22   2010 and that he was paid accordingly.  SUF 48 (Smith Dec. ¶ 26); RSUF 48 (conceding that his

23   high option was made retroactive to October 23, 2010).

24       There is nothing about the processing of plaintiff's grievances to show that he was treated

25   less favorably than similarly-situated employees.  Indeed, the evidence establishes the contrary.

26   Plaintiff obtained the high option with an effective date the same as Powell's.  The alleged delay

27   in obtaining high option at the beginning of the Guarantee Period cannot reasonably be viewed

28   /////

33

1   as an adverse action. [22]  The Guarantee Period began on October 23, 2010, and Dev contends that

2   his most recent grievance was sustained on November 3, 2010 – approximately 11 days later.

3   RSUF at 16.  Moreover, Dev concedes that "High Option was made effective retroactively from

4   October 23, 2010."  *Id.*

5                                            (ii).    Loren Bell

6          Dev also contends in his opposition that a rural carrier by the name of Loren Bell (a

7   Caucasian male) was able to elect the high option as a result of the 2010 National Count "even

8   though he did not qualif[y] for it."  ECF No. 101 at 37.  According to Dev at the time of the 2010

9   National Count, Dev was eligible for high option and was granted high option.  According to

10  Dev, when management employees realized that Loren Bell did not qualify for high option they

11  also took away Dev's "well-deserved" and "well qualified" high option.

12         Dev's extravagant theory that management "snatched away" his high option and "their

13  discriminatory animus exploded" when they realized that Loren Bell was not eligible for high

14  option is both confused and unsupported by any evidence.  *Id.* at 28, 37.  Dev concedes that

15  defendant subsequently realized that "Mr. Bell did not qualify for the High Option and he could

16  not be given the High Option . . . ."  *Id.* at 28.  Accordingly, any suggestion that Loren Bell was

17  treated more favorably than Dev is simply incorrect – neither one successfully obtained high

18  option as a result of the 2010 National Count.  A reasonable jury could not rely on this evidence

19  to find that Mr. Bell was treated more favorably than Dev with regard the high option.  Indeed,

20  the evidence shows that they were treated equally when they were both denied high option.

21                                           (iii).    Other female carriers

22         Lastly, Dev argues that other female carriers were treated more favorably than he with

23  regard to the denial of high option.  Although Dev vaguely alleges that other female carriers were

24  _____

25  [22] Within 10 days his grievance was sustained confirming his high option, retroactively to
    October 23, 2010.  Although his supervisor may have mistakenly failed to schedule him for his
26  route on October 25, the supervisor was promptly reversed and his error "was not sufficiently
    final to constitute an adverse employment action."  *See Brooks v. City of San Francisco*, 229 F.3d
27  917, 930 (9th Cir. 2000) (citing *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 546 (6th Cir.
    1999)) (finding that an unsatisfactory performance evaluation did not constitute an adverse action
28  where the employee filed a grievance and later withdrew it).

                                              34

1   granted high option without a Form 4241 being properly signed when Dev was not, he produces

2   no evidence to support this claim.  He has not introduced any evidence upon which a reasonable

3   fact-finder could conclude that some unspecified female carriers were similarly situated to him

4   with regard to denial of the high option at the time of the National Count but somehow treated

5   more favorably.  Thus, even though the quantum of proof that is required to withstand summary

6   judgment at the *prima facie* case step is minimal, *Davis*, 520 F.3d at 1089, Dev has not adduced

7   any evidence that would allow a reasonable jury to conclude that these other, unnamed female

8   carriers were similarly situated but treated more favorably than Dev.

9                                    b.      Legitimate, non-discriminatory reason

10      Assuming a *prima facie* case, defendant has presented evidence showing that the

11   Postmaster denied Dev's attempt to elect high option on Rural Route 8 for a legitimate and non-

12   discriminatory reason – namely, Dev was not assigned to Rural Route 8 while the National Count

13   was being conducted from February 27, 2010, to March 12, 2010.  ECF No. 55-9, 10 (Smith Dec.

14   ¶¶ 18, 20; Schmidt Dec. ¶¶ 23-25, 28).  Thus, the burden shifts back to Dev to demonstrate that

15   this articulated reason is pretext.  *See Manatt*, 339 F.3d at 800.  As discussed below, Dev has not

16   adduced any evidence upon which a reasonable fact-finder could conclude that explanation by

17   Ms. Smith and Ms. Schmidt for initially denying Dev the high option is a pretext.

18      Dev argues that defendant's articulated reasons for initially denying Dev the high option

19   are false and that Smith's real reason for doing so was discrimination.  He argues that he was the

20   regular carrier on Rural Route 8 and fulfilled all of the requirements for high option during

21   National Count 2010.  Dev points to form 4241 to show that he was the carrier of record for Rural

22   Route 8 during National Count 2010 and that Dev was granted high option in March 2010.  RSUF

23   42 (Pl.'s Ex. 21).  However, that form (ECF No. 103 at 51) simply fails to support his allegations

24   and does not establish pretext.  The form, entitled Rural Statistics Report, merely evidences the

25   undisputed fact that during the interim period that the route was vacant, Dev worked on it.[23]  It

26

27   _____
    [23] Delivery of mail to the customers on the route did not just cease because it was temporarily
    vacant.  Rather, during the vacancy someone had to act in place of the previous carrier.

28

                                          35

1  does not establish that Dev had been competitively selected for and awarded the route as its

2  regular carrier for that time period.  While Dev believes he should have been assigned the route

3  earlier than he actually was, the relevant documentation (the Employee Master File record

4  referred to as Eagan's Mainframe) shows that the route became vacant on February 9, and that the

5  Dev was ultimately selected for the vacancy and awarded the route on March 13, 2010.[24]

6  Schmidt Dec., ECF 55-9 at 8 (Print out showing "L DEV" for Route 8 with the effective date of

7  "03-13-10.").  More to the point, the evidence clearly demonstrates that Dev bid on and accepted

8  a route that had previously been, and was posted as available as, a low option route.[25]

9      Dev also claims that on the morning of February 27, 2010, Smith "assigned" Rural Route

10  8 to Dev.  Dev says that after she did so, Dev asked if he could start working on Route 8 and

11  Smith did not make eye contact with him and instead answered stating that Dev could start later

12  and walked away.  Dev claims that from this he had a feeling something was wrong but continued

13  working on Rural Route 16 for two weeks.  Assuming the truth of this assertion, nothing in those

14  allegations demonstrates pretext or discrimination based on Dev's protected classes.  Dev's

15  reference to his feeling that something was wrong based on Smith failure to make eye contact

16  with him hardly establishes that Smith has presented a false explanation for her motives.

17  /////

18

19  [24] Although Dev contends that he was awarded Rural Route 8 on February 18, 2010 and was "assigned" Rural Route 8 on February 27, 2010, there is no evidence to establish that.  Dev's

20  reference to the Collective Bargaining Agreement is also unavailing.  The Agreement does not speak to the "assignment" of a route.  The Agreement provides that: (1) a route shall be awarded

21  to the senior successful bidder within 10 days of posting the notice of vacancy, and (2) the employee shall be "placed in the new assignment" within 21 days of being designated the

22  successful bidder.  The record plainly shows that Dev was "placed in [his] new assignment"

23  March 13, 2010.  Schmidt Dec. ¶ 23; Smith Dec. ¶ 16.

24  [25] Understandably, Dev is frustrated by what may seem to him a mechanical application of strict union contract rules whereas greater flexibility might have allowed him an exception for an

25  earlier assignment date.  But the managers whose judgment he questions were operating under a complex and comprehensive collective bargaining agreement in which discretion is limited, and

26  there is no evidence that they were motivated in their decision-making as to Dev by anything other than a desire to follow the rules as they understood them.  Nor is there any evidence of

27  disparate treatment of Dev in the application of those rules.

28

1    Finally, as discussed at oral argument on the motion (ECF No. 122 at 18-22), Ms.

2    Schmidt, the Operations Program Support Specialist and District Rural Coordinator, explained in

3    her declaration that she recently (on February 29, 2013) learned from an Accounting and Control

4    Specialist in Eagan, Minnesota, that the Specialist had a different understanding of the rules for

5    when a carrier may elect the high option.  Schmidt Dec. ¶ 29 (ECF No 55-9 at 5).  According to

6    that Accounting and Control Specialist, Dev "could have elected the high option any point prior

7    to the effective date of the [National] Count (4/24/10)."  *Id*.  Ms. Schmidt adds that "[t]his is the

8    first time I have heard this interpretation of the rules from anyone.  We had applied the rule as I

9    understood it in the previous paragraph[26] to all rural routes in the Sacramento District."  *Id*.  For

10   purposes of this motion, the court assumes that the Accounting and Control Specialist in Eagan,

11   Minnesota was correct and that the Sacramento District, and Ms. Schmidt and Ms. Smith in

12   particular, were mistaken in their interpretation of the rules under the collective bargaining

13   agreement.  Nonetheless, there is no evidence that this mistaken interpretation was motivated by

14   racial animus or was applied in a disparate manner.  To the contrary, the only evidence before the

15   court shows that this mistaken understanding of the rules was applied uniformly to all carriers.

16   *Id*.  No evidence has been presented to the court that any carrier was treated more favorably than

17   Dev and granted an exception from the rule as it was understood and applied in the Sacramento

18   District at the time.  Indeed, as discussed with Mr. Dev at the hearing (ECF No. 122 at 10-15), his

19   own cited examples of other carriers actually demonstrates that they were subjected to the same

20   rules as plaintiff and were not permitted to elect the high option unless they were assigned to the

21   route at the time and only during the time of the National Count.  *See* discussion *supra* at Section

22   IV(B)(1)(a)(i) & (ii) re Kimberly Powell and Loren Bell.

23       Thus, while the Rocklin Postmaster's decision may well have been based on a

24   misunderstanding of the collective bargaining agreement, when considering whether Smith's

25   decision is legitimate the key inquiry is whether she "had an 'honest belief' in the proffered basis

26

---

27   [26] The previous paragraph describes the District's interpretation that to be eligible to elect the
     high option the carrier must be assigned to the route in question during time of the National
28   Count.  Schmidt Dec., ECF No. 55-9, ¶ 28.

1   for the adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir.

2   2001).  In making that determination the court looks "to whether the employer can establish its

3   'reasonable reliance' on the particularized facts that were before it at the time the decision was

4   made." *Id.* (citing *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (the question is not

5   whether the employer's decision "was correct measured by 'objective standards'" but rather the

6   relevant inquiry is whether the employer acted with a good faith belief in the proffered

7   explanation.)).  The Ninth Circuit has recognized a similar inquiry in the context of age

8   discrimination claims.  *Douglas v. Anderson*, 656 F.2d 528, 533 n.5 (9th Cir. 1981) ("The focus

9   of the inquiry, at this point, was not a determination of whether Douglas was in fact performing

10  his job adequately, but rather, whether there was sufficient evidence of unsatisfactory

11  performance to be a legitimate concern of his employer . . . .  [W]e are concerned not with

12  whether Hastings was correct in its determination that Douglas's job performance was

13  unsatisfactory, but only with whether this was the real reason for the termination and not a pretext

14  for age discrimination.").  Other circuits have adopted a similar approach at this stage of the

15  analysis.  *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he factual dispute at issue

16  is whether discriminatory animus motivated the employer, not whether the employer is wise,

17  shrewd, prudent, or competent.").  An employer's belief need only be "reasonable [and] not

18  arbitrary." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999).

19          There is no evidence before the court to refute Ms. Schmidt's testimony at paragraph 29

20  of her declaration that her February 2013 communication with a Specialist in Eagan, Minnesota

21  was the first time that she had ever heard of a contrary interpretation of the rule.  The Rocklin

22  Postmaster, Smith, was entitled to rely on the Sacramento District's Operations Program Support

23  Specialist (apparently the district expert on the matter) in concluding that under the applicable

24  rules Dev was not eligible to elect the high option at the time that he attempted to do so.  There

25  simply is no evidence before the court that could reasonably permit the conclusion that Smith did

26  not genuinely believe that the rules prohibited the high option election at the time.  Dev has not

27  introduced any evidence that would suggest that Smith's articulated belief is false or that her

28  decision was motivated by discrimination or retaliation.  Nor has Dev provided any evidence

38

1    upon which a reasonable jury could conclude that the Sacramento District's interpretation of the

2    rule was applied in a disparate or discriminatory manner.

3           In short, Dev has failed to present evidence sufficient to establish a genuine dispute as to

4    whether defendant's articulated reason for initially denying the high option is simply pretext.

5                    2.      Dev was Denied Nullification of Route Evaluation for Rural Route 8

6                            a.      Prima Facie Case

7           Dev contends that Route 8 was incorrectly evaluated during the 2010 National Count, that

8    he requested the results to be nullified, and that the denial of his request for nullification

9    amounted to an adverse employment action based on discrimination.  Defendant argues that Dev

10   cannot establish a *prima facie* case of discrimination regarding his request for nullification

11   because he cannot show that any similarly-situated rural carrier outside of his protected class

12   requested a route evaluation nullification following the 2010 National Count, much less that his

13   or her request was granted.  The record shows that no carrier other than Dev requested

14   nullification of his or her rural route evaluation following the 2010 National Count.  Smith Dec.

15   ¶ 35.

16          Dev again points out that he is a member of a protected class and asserts that that his work

17   performance is in accordance with the employer's expectations but again fails to address the

18   threshold requirement of a *prima facie* case; i.e. a showing that others were treated more

19   favorably.  The focus is whether there is evidence of disparate treatment based on a prohibited

20   motivation; i.e. because of his race, color, sex, or national origin.  Thus, turning to the *prima facie*

21   case step of the inquiry under *McDonnell Douglas* and *Burdine*, the issue is whether Dev can

22   produce evidence showing that he was treated differently than others who were similarly situated.

23   *See Braithwait*, 258 F.3d at 494.  Dev presents no such evidence.[27]  Nothing in the record

24   demonstrates that any similarly-situated employee was treated more favorably than Dev with

25   regard to a request for nullification of a route evaluation.  *See* Smith Dec., ECF No. 55-10, ¶ 35

26   /////

27   _____

28          [27] As defendant points out, Dev does not provide any details as to when he asked for
     "nullification" of the route evaluation and how this request was denied.  ECF No. 101 at 33.

1   (stating that no carrier other than Dev requested nullification of his or her rural route evaluation

2   following the 2010 National Count).

3        Therefore, even assuming Dev meets the first three requirements for a prima facie case

4   (that Dev is a member of a protected class, was performing his job satisfactorily, and suffered an

5   adverse action), no reasonable juror could conclude from Dev's filings in opposition to the

6   motion that he has established the fourth requirement, i.e. that other similarly-situated rural

7   carriers were treated more favorably with regard to the denial of a request for nullification of a

8   route evaluation.  There is simply no evidence of that.

9                       b.        Legitimate, nondiscriminatory reason

10       Again, assuming a *prima facie* case, defendant has submitted evidence showing a

11  legitimate, non-discriminatory basis for not invalidating the count results.  All of the data before

12  the Postmaster demonstrated that the results were accurate.  The Postmaster explains that she

13  rejected Dev's request to nullify the reclassification of Rural Route 8 from a LK40 Route

14  (evaluated at 40 hours with 2 paid relief days and a salary of $50,107) to a LJ41 Route (evaluated

15  at 41 hours with 1 paid relief day and a salary of $51,986) because Dev did not present any valid

16  explanation for why he believed the evaluation of Rural Route 8 was done incorrectly during the

17  2010 National Count.  She further noted that Dev signed a Form 4241 on March 24, 2010,

18  attesting to the accuracy of the count data and Dev presented nothing to show that the count data

19  was inaccurate.  The Postmaster points out that she held two pre-count conferences[28] and that the

20  other two replacement carriers who also worked on Rural Route 8 during the 2010 National

21  Count did not submit any questions or disputes during or after the count.  Smith Dec., ECF No.

22  55-10, ¶ 31; RSUF 54.  In light of those legitimate explanations, Dev must show pretext.  *See*

23  *Manatt*, 339 F.3d at 800.

24       Apparently in an effort to show pretext, Dev argues that the two pre-count conferences

25  cannot be considered valid because the other two temporary carriers on the route did not bother to

26

27  _____
[28] The Collective Bargaining Agreement requires Postmasters to hold a pre-count conference with
28  supervisors and rural carriers to discuss count procedures at least 15 days prior to the start of the
count.

1   show up.  But Smith explained that although she availed them of the opportunity to provide their

2   comments and information on the matter, as required by the union contract, the Postmaster cannot

3   compel carriers to attend a pre-count conference.  Smith Dec. ¶ 30.  Further, the record shows that

4   the Postmaster provided each of the carriers (including Dev) a fair and meaningful opportunity to

5   present their views and information on the matter.  Although the three replacement carriers who

6   carried Rural Route 8 did not attend the pre-count conference on February 11, 2010, the

7   Postmaster scheduled and held a second pre-count conference on February 12, 2010.  Further, at

8   least one of the carriers (Patrice Jackson) had an individual meeting with the Postmaster to

9   provide her views.  Thus, while Dev argues that the failure of the others to attend a pre-count

10   conference somehow means that the entire count process and results must be nullified, none of

11   those other replacement carriers who carried Rural Route 8 during the 2010 National Count raised

12   any questions or disputes during or after the 2010 National Count.  Further, Dev cites no authority

13   for his argument that the mere fact that other carriers chose not to attend a pre-count conference

14   invalidates the results of the count.  Finally, Dev presents no persuasive explanation for how any

15   of this shows that the Postmaster has articulated a false explanation for disagreeing with Dev as to

16   the accuracy of the count data.[29]

17        Dev also argues, without elaboration, that during the 2010 National Count, "every

18   Caucasian, White employee worked on his or her own route," while he was "compelled to work

19   on a vacant route."  Pl.'s Opp'n, ECF No. 101 at 38.  He makes this assertion in the context of his

20   argument that the 2010 National Count should have been nullified.  Thus, his precise point as to

21   how the allegation, if true, demonstrates that Smith's explanation for not nullifying the results is a

22   pretext is difficult to follow.  Assuming a nexus, however, Dev does not identify the "Caucasian,

23   White employees" that he references.  Nor does he state that only Caucasian employees worked

24   on their own routes during the 2010 National Count.  *Id.*  Moreover, the first day that Route 8 was

25   actually assigned to plaintiff was on March 13, 2010, the day after the 2010 National Count

26

27   [29] Indeed, the National Rural Letter Carriers' Association and the Postal Service agreed in the
     settlement of Dev's grievance that the Postal Service had followed the correct procedure during
28   and after the 2010 National Count.

41

1   ended.  Dev's assigned route before and during the 2010 National Count was Route 16.  Smith

2   Dec. ¶¶ 7, 16 & 17; Schmidt Dec. ¶ 23; Pl.'s Opp'n, ECF No. 101 at 29.  Thus, while "[a]

3   showing that [the defendant] treated similarly situated employees outside [Dev's] protected class

4   more favorably would be probative of pretext," *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634,

5   641 (9th Cir. 2003), Dev presents no evidence of that here.  Neither has Dev submitted any

6   evidence upon which a reasonable jury could find that the Postmaster's proffered reason for not

7   nullifying the 2010 National Count was pretext.

8           3.      Dev was not given additional territory on Rural Route 8 upon the

9                   consolidation of Rural Routes 18 and 19.

10                          a.      Prima Facie Case

11          Dev claims that he was excluded from the allocation of additional territory for rural

12   carriers based on racial discrimination.  He contends that Smith and Crabtree split two vacant

13   routes, with territory in middle of his route, and distributed the territory among several carriers

14   but offered none of the territory to him.  He argues that he had more seniority and was more

15   efficient than those who received additional territory.  He asserts that every female white carrier

16   was given territory and that the most junior carrier was given the most territory.  He also claims

17   Vicky Ardoin was given additional territory and she is one of the least efficient carriers.

18          Dev further claims that Rural Route 18 was not available for consolidation on June 19,

19   2010, yet it was split and the territory was given to Caucasian employees.  Dev also contends that

20   Smith and Crabtree appointed Jamie Flanagan to do the alleged route consolidation project even

21   though Flanagan is Crabtree's daughter.  Dev contends that even though the consolidation was

22   not within Smith's authority, Smith and Crabtree split the route and gave the territory to their

23   favorite employees.

24          Defendant argues that Dev cannot establish a *prima facie* case as to this claim because he

25   cannot show that similarly-situated letter carriers outside of his protected class were treated more

26   favorably than him.  Specifically, it is undisputed that Dev never notified the Postmaster that he

27   was interested in receiving additional territory on his route from Rural Routes 18 and 19, despite

28   the fact that the Postmaster informed all of the rural carriers that, if they wished to receive

1    additional territory, they needed to inform her of such in writing.  ECF No. 55-10 (Smith Dec.

2    ¶ 45); ECF No. 55-5 (Olsen Dec. Ex. J (Dev Dep. at 154-55)).  The defendant also observes that

3    the rural carriers who received territory from Rural Routes 18 and 19 consisted of a diverse group

4    of rural carriers.[30]  Similarly, the rural carriers who did not receive territory from Rural Routes 18

5    and 19 consisted of a diverse group of rural carriers.[31]

6           Dev argues at length over whether the consolidation of Rural Routes 18 and 19 was

7    permissible under the collective bargaining agreement or the Postal Service Handbook.  However,

8    as noted previously, the issue here is whether Dev was treated differently or was subjected to

9    discrimination because of his race, color, national origin, or sex.  *See Braithwait*, 258 F.3d at 494.

10   Dev does not present evidence that a decision was made to deviate from the contract or the

11   handbook because of racial animus, or that the rules under those documents were applied in a

12   disparate fashion.  And, significantly, Dev simply does not dispute the fact that he failed to

13   comply with the specific instruction that, if interested, he like all other carriers was to place his

14   request for the additional territory in writing.

15          Thus, he fails to overcome a threshold and fundamental barrier to this claim.  He was not

16   similarly situated to those who complied with the directive to submit their requests for additional

17   territory in writing.

18   /////

19   /////

20

21   [30] The group is as follows: Kimberly Powell (Caucasian, White, American, Female); Sonny Pham
     (Asian, Brown, Vietnamese, Male); Ramon Limon (Hispanic, Brown, Mexican, Male); Oscar
22   Bosch (Hispanic, Brown, Cuban-American, Male); John Bucciarelli (Caucasian, White,
     American, Male); Vicki Ardoin (Caucasian, White, American Female); Annette Crabtree
23   (Caucasian, White, American, Female); Mary Grace Carlton (Caucasian, White, American,
     Female); John Andama (Asian, Brown, Philippino-American, Female); Kimberly Ratkowski
24   (Caucasian, White, Indian-American, Female); and Suzanne Smith (Caucasian, White, American,
     Female).  Smith Dec. ¶ 48.
25
     [31] The group is as follows: Oleg Tysrul (Caucasian, White, Russian, Male); Mei Chen (Asian,
26   Brown, Chinese, Female); Lal Dev (Asian, Brown, Indian, Male); John Casey (Caucasian, White,
     American, Male); Kenneth Manning (Caucasian, White, American, Male); Loren Bell –
27   Caucasian, White, American, Male); and Louis Dematos (Hispanic, Brown, American, Male).
     Smith Dec. ¶ 49.
28

b.      Legitimate, Non-Discriminatory Reasons

For similar reasons, Dev fails to show pretext.  Assuming a *prima facie* case, the Postmaster has articulated a legitimate and non-discriminatory reason for why Dev did not receive territory from Rural Routes 18 and 19 – namely, Dev did not ask for any additional territory.  The Postmaster explained that Dev was not given any territory from Rural Routes 18 and 19 because he did not ask for any.  The Postmaster notes that she held a meeting with all of the rural carriers and informed them that if they wished to receive additional territory from Routes 18 and 19, they needed to inform her in writing.  Dev conceded this fact in his deposition testimony.  Regarding the instruction to make the request in writing Dev testified:  "Well, sir, Ms. Smith was asking to – during that stand-up, she was saying: 'Okay, these routes are' – I think she said, 'These routes will be divided, and the territory will be added to the routes.'  And so she – to the best of my recollection, she said, 'Okay, you can submit your views and comments and give me in writing.'"  ECF No. 55-5 at 41 (Olsen Dec. Ex. J (Dev Dep. at 155)).  Dev also conceded that he did not request any territory from Rural Routes 18 and 19, either in writing or orally.  Regarding his failure to comply with the instruction, he testified as follows:

> Q. Did you ask for it?
> A.  Please.  During the national – okay.  At the time of 2010, no, I did not submit my request in writing for additional territory.
> Q. Did you submit your request orally for any additional territory in 2010?
> A. No, I did not submit request orally for any additional territory in 2010.

ECF No. 55-5 at 41 (Olsen Dec. at Ex. J (Dev Dep. at 154-55)).

Notwithstanding these very admissions, Dev makes the curious claim that defendant's reason for denying additional territory is false.  He argues that he never "refused" additional territory and that any additional territory should be given to the best suited employee.  In light of Dev's deposition testimony, his vague statement cannot reasonably be read as denying that Smith informed Dev and the other rural carriers at a stand-up meeting that Rural Routes 18 and 19 would be consolidated, that the territory from these routes would be reallocated, and that rural carriers interested in receiving territory were required to submit their requests in writing.

Although Dev contends that Smith "invited the Caucasian, White employees personally to her office to submit the requests," ECF No. 101 at 36, plaintiff has not offered any admissible

evidence of his claim that other employees were given territory without complying with the requirement that requests for additional territory must be submitted in writing.[32]  The undisputed evidence shows that Smith specifically directed that any rural carrier who was interested in obtaining territory from consolidated Rural Routes 18 and 19 was required to submit such a request in writing, and that Dev did not submit such a request.[33]  Dev concedes as much and he has provided no evidence of pretext.

/////

/////

_____

[32] Further, the hearsay statements plaintiff submits fail to support his factual assertion.  The Casey declaration merely asserts that he, a Caucasian, was invited to submit his request in writing, he submitted it, but he did not get more territory.  Pl.'s Exs., ECF No. 103, at 137.  The Powell declaration asserts that she was invited to submit her request, she did so and she received more territory.  *Id*. at 138.  The Bell declaration asserts that he was invited to submit his "comments" and that he did not get any additional territory.  He does not state whether he actually submitted a written request for additional territory, but in any event he at least submitted something.  *Id.* at 139.  The Bosch declaration asserts that he was invited to submit his comments, and that he "did not lose any territory from [his] route."  *Id*. at 140.  He also fails to state whether he actually submitted a written request for additional territory.  None of these declarations shows that the Postmaster made exceptions to the requirement that requests for additional territory be submitted in writing.  Further, Dev concedes that he, too, was invited at the meeting to submit such a request and he failed to do so.

[33] Dev argues that Smith's testimony is inconsistent about the date of the meeting at which Smith announced that anyone who was interested in receiving territory from consolidated routes 18 and 19 needed to submit a request in writing (in her declaration, Smith asserts that the meeting occurred on May 25, 2010, whereas in an affidavit submitted in the EEO proceeding, Smith asserted that the meeting occurred on May 20, 2010).  Pl.'s Opp'n, ECF No. 101 at 36.  However, Dev does not dispute Smith's testimony on the key fact that, regardless of when the meeting occurred, she directed that anyone who wanted territory needed to submit his or her request in writing.  In his deposition, Dev confirmed Ms. Smith's key factual assertions.

> Q. Did you ask for it?
> A. Please.  During national – okay.  At the time of 2010, no, I did not submit my request in writing for additional territory.
> Q. Did you submit your request orally?
> A. No, I did not submit request orally for any additional territory in 2010.
> Q. Why not?
> A. Well, sir, Ms. Smith was asking to – during that stand-up, she was saying: "Okay, these routes are" – I think she said, "These routes will be divided, and the territory will be added to the routes." And so she – to the best of my recollection, she said, "Okay, you can submit your views and comments and give me in writing . . . ."

ECF No. 55-5 at 56 (Supp. Olsen Dec. Ex. O (Dev Dep. at 155)).

4.      Case Labels and  Delivery Point Sequence ("DPS")

a.      Prima Facie Case

Dev contends that when he took over Route 8, it was a mess.  Therefore, he says, in April 2010 he requested new case labels and that his DPS mail be arranged in a particular sequence.  He complains that from April through November this was not done.  On the other hand, he claims that new labels and DPS changes were incorporated into about 11 other routes on June 19, 2010.  He argues that the delay as to his request amounted to an adverse employment action based on discrimination.

Defendant argues that Dev cannot demonstrate that similarly-situated rural carriers outside of his protected class were treated more favorably with respect to the labels and DPS sequencing and therefore fails to establish a *prima facie* case of discrimination.   Defendant also argues that such a delay cannot reasonably be characterized as an adverse employment action.

Here, although he alleges it, Dev has not shown disparate treatment.  He presents very little in the way of actual evidence on the matter.  His vague references to other rural carriers who received territory from Rural Routes 18 and 19 as being the other carriers who received case labels and DPS sequencing in a more timely manner does not establish that other employees outside plaintiff's protected class were treated more favorably than Dev.  As discussed previously, the rural carriers who received territory from Rural Routes 18 and 19 consist of a widely-diverse group of rural carriers including carriers who are male, whose color is brown, and whose race is Asian.[34]  Further, Dev also fails to identify who was responsible for these rural carriers getting their case labels and DPS sequencing, and whether that same individual was allegedly responsible the delay in his case labels and DPS sequence.

_____

[34] The group is made up of the following people: Kimberly Powell (Caucasian, White, American, Female); Sonny Pham (Asian, Brown, Vietnamese, Male); Ramon Limon (Hispanic, Brown, Mexican, Male); Oscar Bosch (Hispanic, Brown, Cuban-American, Male); John Bucciarelli (Caucasian, White, American, Male); Vicki Ardoin (Caucasian, White, American Female); Annette Crabtree (Caucasian, White, American, Female); Mary Grace Carlton (Caucasian, White, American, Female); John Adama (Asian, Brown, Philippino-American, Female); Kimberly Ratkowski (Caucasian, White, Indian-American, Female); and Suzanne Smith (Caucasian, White, American, Female). Smith Dec. ¶ 48.

46

1     Dev also fails to establish that the delay in question here had serious enough consequences

2 to effectively alter the terms and conditions of his employment.  Defendant's argument focuses on

3 the relative duration of the delay.  While relevant, the duration alone is not decisive.  There is "an

4 expansive view of the type of actions that can be considered adverse employment actions," *Ray v.*

5 *Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000).  Indeed "[w]e phrase the standard in general

6 terms because the significance of any given act . . . will often depend upon the particular

7 circumstances."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006).  Thus, the

8 inquiry may take account of--but does not hinge only on the duration that the plaintiff was

9 deprived of the case labels and DPS.  Rather, the focus is on whether that delay "'materially

10 affect[s] the compensation, terms, conditions, or privileges of . . . employment.'"  *Davis*, 520 F.3d

11 at 1089.  Here, however, Dev has not introduced any evidence that the delay between April 2010

12 (when Dev asserts that he first requested new case labels and that his DPS be put in the sequence

13 he desired) and November 2010 (when Dev received his new case labels and his DPS was

14 changed in the way he wanted) materially affected the compensation, terms, conditions, or

15 privileges of employment.[35]  Absent such evidence, a jury could not reasonably conclude that the

16 delay constituted an adverse employment action.

17 /////

18 /////

19

20 [35] Dev argues that the delay was an adverse action because "Counsel for government and Dev
   agreed for damages for fourth cause alone, for the amount equal to $5000."  ECF No. 101 at 25
21 (citing a page from his deposition transcript).  Counsel for government did not, in fact, agree to
   any amount of damages with respect to Dev's fourth cause of action. This figure was provided by
22 Dev in response to a question by government's counsel asking Dev to provide a ballpark estimate
   of his damages attributable to the delay in receiving updated case labels and new DPS sequence.
23 ECF No. 55-5 (Supp. Olsen Dec. Ex. O (Dev Dep. at 198)).  Dev explained in his deposition that,
   as a result of the delay, it took him approximately one hour more per day to complete his route.
24 *Id*. at 195-96. The flaw in Dev's contention – that the delay constitutes an adverse action – is that
   rural carriers are not paid by the hour.  Schmidt Dec. ¶ 6.  Instead, they are paid a salary based on
25 the evaluated time for completion of the route to which the rural carrier is assigned, and Dev does
   not allege that the evaluated number of hours for Rural Route 8 was affected by the delay in
26 receiving updated case labels and new DPS sequence.  Nor has Dev refuted the fact that he
   altered his line of travel without following the appropriate procedure that could have resulted in
27 the DPS change he wanted.

28

1                              b.        Legitimate, Non-Discriminatory Reasons

2              Even assuming an adverse action, the Postmaster has articulated legitimate, non-

3      discriminatory reasons for any delay.  With regard to case labels, the Postmaster explains that she

4      was not aware of Dev's desire for new case labels until after the EEO process was initiated.

5      Smith Dec. ¶ 38.  She also explains that the procedure Dev should have followed to obtain new

6      case labels would have been to contact his immediate supervisor, who would have then

7      accompanied Dev on his route to determine which route of travel was the most efficient.  That

8      determination would then determine the sequence of case labels.

9              It is undisputed that "[a]t some point after beginning his assignment on Rural Route 8,

10     Dev approached his supervisor Verenice Roubert, stating that he was interested in new case labels

11     and having his DPS put in a desired sequence . . . ."  ECF No. 101 at 62.  However, the record

12     does not support the contention that the request was simply ignored.  Rather, the evidence shows

13     that Ms. Roubert, who did not fully understand the case labels and DPS sequencing (ECF No. 55-

14     11, ¶ 9), put Dev in contact with other individuals who did understand the system.  Roubert

15     recalls suggesting that Dev speak with Lisa Rodriguez, a city carrier with expertise at case labels

16     and sequencing.  ECF No. 55-11 (Dec. of Verenice Roubert ¶ 7).  Dev admits as much.  ECF No.

17     101 at 62 (RSUF 63).  Ms. Roubert also suggested that an Address Management Department

18     employee and Dev talk directly about case labels and DPS.  SUF 64 (Roubert Dec. ¶ 9); RSUF 64

19     (disputed as immaterial).  Ultimately, Dev received the case labels and the DPS sequencing that

20     he requested.  SUF 65 (Olsen Dec. Ex. J (Dev Dep. at 191-92)); RSUF 65.  According to Roubert,

21     Dev's race, sex, national origin and color had absolutely nothing to do with when Dev actually

22     received the case labels and when his DPS was put in his preferred sequence.  Roubert Dec.

23     ¶ 12.

24             While Dev contends that his request was not satisfied timely, Dev presents no evidence

25     that can support a finding that the process was delayed because of his race, or that Roubert's

26     explanation of the process is a pretext.  Although Roubert thinks that she mentioned Dev's

27     request regarding labels and DPS sequencing to Smith but does not recall what was said (ECF

28     No. 55-11 ¶ 10) and Smith does not recall hearing about it until the EEO process was initiated (*Id.*

48

1   ¶ 38), that in no way demonstrates that the defendant has provided a false account of how

2   plaintiff's request was handled.  Although Dev argues that the Postmaster has simply provided a

3   false explanation, he presents no evidence to establish that it is false.  His bare assertion lacks any

4   evidentiary support and falls well short of the requirement that a plaintiff introduce substantial

5   and specific evidence of pretext.  *See Anthoine v. N. Cent. Counties Consortium*, 605 F.3d 740,

6   753 (9th Cir. 2010) (quoting *EEOC v. Boeing Co*., 577 F.3d 1044, 1049 (9th Cir. 2009)); *See also*

7   *Davis*, 520 F.3d at 1089 (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1038

8   (9th Cir. 2005) ("[A]plaintiff's circumstantial evidence of pretext must be "specific" and

9   "substantial.")).  It is plaintiff who bears the burden of proof on this question and absent evidence

10   that could justify a reasonable jury rendering a verdict in plaintiff's favor on the matter, summary

11   judgment must be granted.  *Anderson*, 477 U.S. at 248, 252; *Celotex*, 477 U.S. at 323.

12              5.    Dev was denied a temporary supervisor position referred to as a "204b

13                    position"

14                    a.    Prima Facie Case

15          Defendant argues that Dev cannot establish a prima facie case of discrimination with

16   regard to his claim that he was not considered for a 204b temporary supervisor position because

17   he cannot point to any similarly-situated individuals outside his class who were treated more

18   favorably than he was.  Dev points to Annette Crabtree and Ronna Williams as examples of

19   similarly-situated employees who were treated more favorably.

20          Although Dev believes that Annette Crabtree (Caucasian, White, female) was treated

21   more favorably than he was, Ms. Crabtree is not similarly situated.  It is undisputed that she had

22   worked as a 204b supervisor since prior to the Postmaster's arrival at the Rocklin Post Office and

23   had demonstrated her ability to perform the functions of a 204b supervisor.  Smith Dec. ¶ 55.

24   Unlike Dev, she already worked in the supervisory position and they were not similarly situated.

25   *See Vasquez*, 349 F.3d at 641 ("Employees in supervisory positions are generally deemed not to

26   be similarly situated to lower level employees.")

27          On the other hand, Ronna Williams appears to have been similarly situated in that she and

28   Dev occupied the same job.  Although Ms. Williams and Dev worked at different offices, they

49

1   were both rural carriers.  ECF No. 55-6 (Olsen Dec. Ex. N (Ronna Williams Dep. at 13)).

2   Notwithstanding the difference in location, they both worked as rural carriers who were

3   responsible for the same or very similar job functions.  *Nicholson v. Hyannis Air Serv., Inc*., 580

4   F.3d 1116, 1125 (9th Cir. 2009) (citing *Vasquez*, 349 F.3d at 641 (9th Cir. 2003) ("[I]ndividuals

5   are similarly situated when they have similar jobs and display similar conduct.")).

6          Thus, the court assumes plaintiff is able to establish the minimum threshold for a case on

7   this claim.  Accordingly, the burden of production shifts to defendant to articulate legitimate, non-

8   discriminatory reasons for the purported adverse actions.  *Manatt*, 339 F.3d at 800.  If defendant

9   meets that burden, the burden then shifts back to Dev to show pretext.  *Costa*, 299 F.3d at 856.

10                     b.     <u>Legitimate, Non-Discriminatory Reasons</u>

11          The Postmaster has explained that Dev never made a written request for a 204b position.

12   Smith Dec. ¶ 53.  Both Jose Martinez and Daisy (Amandeep) Spring expressed in writing their

13   desire to serve as 204b supervisors.  *Id*. ¶ 54  Annette Crabtree had served as a 204b since before

14   the Postmaster's arrival at the Rocklin Post Office and the Postmaster was well aware that Ms.

15   Crabtree had been trained and was capable of performing the functions of a 204b supervisor.  *Id*.

16          In response, Dev claims that Smith's explanation for denying Dev a promotion to 204b

17   supervisor (i.e. that Dev never submitted a request in writing) is baseless.[36]  Rather than dispute

18   the fact that he did not request such consideration, either in writing or orally, Dev asserts that the

19   position was never offered to him and that Smith did not post the vacancy as required and that

20   Smith never instructed plaintiff to submit the request in writing.  Dev Aff. ¶ 13.  The record is not

21   clear whether the temporary 204b assignments must be posted.  They are not true vacancies or

22   promotions in the sense that the position is available for competitive consideration and

23   promotion.  Rather, "[a] 204b position is a 'detail' assignment in which a career craft employee

24   fills in as an acting supervisor on an as needed basis when the supervisory staff is short-handed.

25   The selections are at the discretion of local and district upper management."  ECF No. 55-9 at 6

26   _____

27   [36] In an attempt to explain why he failed to submit a PS Form 991, Dev provided only the
following unhelpful statement:  "A. I did not submit because there is another guy submit 991 for
several years and it is rotting [sic].  Q. Just gathering dust?  A. Yeah. . . ."  ECF No. 55-5 at 54

28   (Olsen Dec. Ex. J (Dev Dep. at 209)).

(Schmidt Dec.); ECF No. 55-10 at 7 (Smith Dec.).  The temporary nature of the appointment suggests that a process of posting a vacancy each time an acting supervisor is necessary would be self-defeating.  "A 204b supervisor may be supervising for the day, two days, a week or a few hours as needed."  Thus, the discretionary and time-limited nature of these temporary assignments supports, rather than undermines, the Postmaster's explanation that if employees want to be considered for such temporary assignments they must communicate that interest to the Postmaster rather than simply wait for it to be assigned to them.

Dev also claims that Smith gave preferences to females over males and preferred white employees over nonwhite employees.  While Dev makes such assertions, he again fails to present evidence to support those allegations.  Instead, he actually points to Sukhchain Aulakh (Asian Indian, Brown, Male) as receiving a temporary 204b assignment.  He also point to Amandeep Spring (Asian Indian, Brown, Female); Jose Martinez (Hispanic, Brown, Male).  The fact that individuals in Dev's protected classes (male and Asian) received such assignments militates against finding that defendant's proffered justification is merely a pretext to conceal discrimination against members of those classes.

Dev has not presented evidence upon which a reasonable jury could find that Smith's proffered reason for not placing Dev in a temporary 204b assignment is a pretext to conceal discrimination.  Therefore, defendant's motion for summary judgment should be granted on this claim.

V.   CONCLUSION

Accordingly, it is hereby RECOMMENDED that:

1.  Defendant's motion for summary judgment, ECF No. 55, be granted;

2.  Plaintiff's motions to strike, ECF Nos. 71, 73, 76, 77, 78, 82, and 86, be denied;

3.  Plaintiff's motion to add defendants, ECF No. 83, be denied;

4.  All other outstanding motions be denied; and

5.  The Clerk be directed to enter judgment in favor of defendant and close this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

51

1    after being served with these findings and recommendations, any party may file written

2    objections with the court and serve a copy on all parties.  Such a document should be captioned

3    "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

4    within the specified time may waive the right to appeal the District Court's order.  *Turner v.*

5    *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

6    Dated:  October 16, 2013.

7

8                                          EDMUND F. BRENNAN
                                           UNITED STATES MAGISTRATE JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28